(No. 54466.—)

*In re* WILLIAM HENRY BARRICK, Attorney,
Respondent.

*Opinion filed November 13, 1981.*

Philip Schickedanz, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

Sidney Z. Karasik, of Chicago, for respondent.

MR. JUSTICE SIMON delivered the opinion of the court:

A will which the respondent, William Henry Barrick, drafted in July 1974 for a client, Mrs. Josephine Caster, who died 7 months later, included a lifetime annuity for the respondent of $12,000 per year, the amount he had been receiving as an annual retainer from Mrs. Caster. The actuarial value of the bequest was 4½% of the estate. The Administrator of the Attorney Registration and Disciplinary Commission filed a complaint charging that, because of the bequest to himself, the respondent, in preparing the will, engaged in conduct tending to bring the legal profession into disrepute and violating Disciplinary Rule 5—101(A) of the Illinois Code of Professional Responsibility (1977). The hearing panel concluded that the respondent's conduct was "calculated to diminish the integrity of the legal profession, and deliver it into disrepute and ignominy while suffering the administration of justice to suspicion and reproach." It recommended suspension for 6 months and until further order of the court.

Before the Review Board, the Administrator conceded that it was unnecessary for the suspension to continue "until further order of the court" and requested the deletion of that provision from the recommendation. The Review Board issued a brief order without explanation recommending dismissal of the complaint. This court then granted leave to the Administrator to file exceptions to the recommendation of the Review Board.

The respondent has been a member of the Illinois bar for 43 years, practicing mostly in Rockford. Louis Caster, the husband of Josephine Caster, was a successful Rockford businessman, a man of substantial wealth and one of Barrick's clients. He died in 1960.

The Casters' closest friends were Clint Maslen and his

wife, who were also from Rockford. Maslen commenced working for Mr. Caster in 1936 as office manager of a bakery Caster owned. They continued as close associates until Caster's death. Over the years Caster and Maslen formed many business enterprises together, and Maslen functioned as business manager for Caster and his enterprises. After Caster's death, Maslen continued in the same role as manager of Mrs. Caster's affairs. Prior to his death Louis Caster told Maslen "that Mr. Barrick had done much work for him and in his opinion was a very acceptable attorney." Also before his death, Caster informally told the judge in charge of Winnebago County probate matters "that probably William H. Barrick would be settling their estates [Mr. and Mrs. Caster's], since he utilized him for some of his law business and was impressed with the utmost confidentiality with which Mr. Barrick handled his affairs."

When Caster died, Mrs. Caster picked the respondent to probate his will. She selected him from a list of Rockford attorneys that Maslen submitted to her. After that, the respondent represented Mrs. Caster and because of this representation met with her frequently.

The evidence is not contradicted, as the Commission offered no testimony except to call the respondent himself as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). The unrebutted testimony of the respondent and Maslen established that the suggestion that the respondent be included as a legatee in her will originated with Mrs. Caster. When Mrs. Caster and Maslen were discussing changes in her will which Barrick advised her were needed because of changes in the revenue code, she told Maslen she wanted to remember the respondent in her new will. She said she wanted him to receive annually the yearly amount he was receiving as a retainer. When Maslen communicated Mrs. Caster's wish to the respondent, who had made no effort to be named in the will, Barrick replied that it would be unusual for him to

draft the will and also be named as a legatee. If Mrs. Caster insisted upon a legacy for him, Barrick said, it would be best for her to select another lawyer to draft her new will. When Maslen passed on this advice, Mrs. Caster said she did not want another lawyer because she did not want her business aired to the world. She was adamant about having the respondent prepare her new will in the way she wanted it drawn. Maslen reported Mrs. Caster's decision to the respondent and told him she wanted the respondent to figure out a way he would be able to draft the will as she wanted it done.

At two later meetings with Barrick, Mrs. Caster refused to change her mind, rejecting Barrick's suggestions that another lawyer draft, or at least review, the will. Mrs. Caster said that she did not want anyone else to know her business or to have it discussed by other lawyers and accountants. She feared that some charitable organizations in Rockford might, if other lawyers were brought in, learn that they had been omitted or what amount they had been left. She was concerned that the omitted organizations would importune her to include them while others might seek to persuade her to be more generous toward them. When the respondent suggested to Mrs. Caster that it would be better for him not to be included in her new will, she responded she did not want to run any chance that the respondent would not get something from her estate after all he had done for her.

The respondent testified, when questioned by the Administrator's attorney, that they had considered having a codicil to the will drafted by an independent attorney providing for the legacy for the respondent. However, he pointed out that, because of the manner in which the will was drafted, a person preparing such a codicil would have to see the will itself in order to be satisfied that the codicil would not defeat the tax benefits the respondent sought to achieve for Mrs. Caster. This, of course, would expose the nature of the

charitable bequests and the identity of the organizations receiving them to additional persons.

To satisfy Barrick, Mrs. Caster arranged to have three employees of a Rockford bank, who were unknown to Barrick, witness the will. The signing took place at Mrs. Caster's residence. Before the execution, the respondent explained to the three witnesses that he and Maslen were both beneficiaries under the will. He offered to excuse himself and Maslen from the room so that the witnesses could ask Mrs. Caster any questions they had. Mrs. Caster responded to this suggestion by observing that such precautions were unnecessary, and, according to respondent, she said, "I will have none of that monkey business. I know what I am doing. You don't have to be doing anything like that. These men have done more for me than anybody else and they deserve what I am doing for them."

The Illinois State Bar Association Code of Professional Responsibility was the code generally followed in attorney disciplinary proceedings in Illinois at the time the will was prepared. (See *In re Taylor* (1977), 66 Ill. 2d 567, 571, stating that the canons contained in the Code are a safe guide for professional conduct, and an attorney can be disciplined for not observing them.) The hearing panel acknowledged in its report that there is no precise printed rule in the Code prohibiting a lawyer-draftsman from including himself as a beneficiary in a will drawn for his client. However, the complaint alleges that the respondent's conduct violated Disciplinary Rule DR 5—101(A) of the Code, which was in effect when the respondent drafted the will. It provided:

"DR 5—101(A)

(a) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

The Administrator has not explained how the respondent's professional judgment might have been affected by his own interest. However, when an attorney drafts a will naming himself as a beneficiary, the potential for abuse in the clash of roles is serious enough that the attorney must be deemed to suffer from a conflict of interest, and some effect must be presumed possible. Moreover, what the respondent did looks bad. Few wills satisfy everyone, and the natural tendency of those disgruntled with their own shares to suppose undue influence and overreaching by the attorney harms the reputation of the profession. Writing oneself into a will cannot, therefore, be routinely condoned.

Neither, however, should it be automatically condemned. In special circumstances, it may be proper. We shall not try to define all the possible justifications for an attorney's putting himself in a will; but, the circumstances of this case justify the respondent's decision to do so.

What the respondent did was at his client's insistence and in his client's interest. A doctrine under which no attorney could ever feel secure in including himself in a will would itself create conflicts of interest that would not otherwise exist. Fear of discipline would give the attorney a compelling personal incentive to have the will drafted by someone else even if, as here, that personal interest might conflict with the client's needs. The attorney would be tempted to exaggerate the problems of drafting the will himself as the client demands and to understate the problems which might be involved if another attorney is brought in to do the job.

There was nothing unreasonable or improper in Mrs. Caster's determination to leave a small part of her estate to the respondent, whom she viewed as one of the two men who had done a great deal for her and her late husband. Even the Administrator does not suggest that an attorney may under no conditions accept money from a client. An ungracious refusal of the money on what to Mrs. Caster

seemed foolish grounds would only have strained their relationship to no good purpose.

Mrs. Caster's insistence that the respondent draft the will himself was also reasonable. His employment for that purpose assuaged her fear the community might learn of the legacies she was leaving. Her confidence that his counsel and draftsmanship would not be distorted by his annuity was, so far as the record shows, justified. Her distrust of other attorneys, who she feared might divulge her charities to their acquaintances, is debatable, but supported by her experience. We cannot quarrel with her conclusion that she would be better served by the respondent. We cannot fault the respondent for agreeing that if that was what she wanted she should have it. He was not required to resist to the point of offensiveness. The choice was hers to make, and Barrick would not have served his client properly had he persisted in frustrating her wishes.

An attorney must not, of course, decide unilaterally whether the circumstances justify his accepting employment despite a conflict of interest. He may not proceed to represent his client without her free, intelligent, and informed consent. He must make sure she knows and understands the conflict and the threat it poses to the attorney's objectivity, and any other considerations material to the client's decision whether to entrust her affairs to the attorney. He must also take suitable precautions to minimize the dangers and disadvantages to the client of his double role, including the risk that the attorney's advice about the initial decision to proceed despite the conflict may itself be biased. And for his own protection, he should be prepared to prove later what really happened. All of this the respondent did.

A fair appraisal of the evidence leads to the conclusion that the respondent made a full disclosure to his client of the ethical considerations involved in his drafting the type of will she desired. He also knew that she received disinter-

ested advice from Maslen, a person independent of him who was cognizant of all the circumstances. The client herself was "sharp" and not easily taken advantage of. The respondent took the precaution of having the will witnessed by strangers to whom Mrs. Caster spoke her mind on the problem, thereby preparing a defense to any will contest his own inclusion might inspire. The will was in fact probated without incident. We believe the respondent's conduct complied with DR 5—101(A).

The Administrator has cited only two Illinois cases in his briefs, *In re Saladino* (1978), 71 Ill. 2d 263, and *In re Anderson* (1972), 52 Ill. 2d 202. The facts of each case are different from this, and as precedent they are not persuasive. In *Saladino,* where the attorney was suspended for 3 months, he was named as the sole residuary legatee in a will he drafted, which also provided for a bequest of a diamond ring to his wife. This court agreed with the Review Board that the evidence was not clear and convincing that in naming himself and his wife as legatees he was carrying out his client's wishes. And, there was no suggestion by the attorney that he advised his client to obtain the services of another attorney or of any ethical problems which were involved in his service to the client.

*Anderson* involved an attorney who arranged for his client to transfer her home, her principal asset, to a land trust in which he and the client were beneficiaries as joint tenants without making any disclosures as to the ethical propriety of his conduct or recommending she consult another attorney. In addition, this court found in the record a course of conduct involving obliteration of records, deliberate omissions in documents filed in an estate administration, and testimony which it labeled contradictory or false. The respondent in *Anderson* failed to disclose his role in the matters which were the subject of inquiry with the candor that Barrick did in the matter now before us.

In this case, although undue influence might, on the

basis of legal principles, have been presumed, the evidence established that there was none. There was no overreaching by the respondent. On the contrary, he urged his client to employ another attorney, until she would hear no more about it. Exactly how far to press the point was a matter of judgment, and we will not snipe at the respondent's. He knew Mrs. Caster; we do not.

We should not discipline the respondent for abiding by his client's decision when it was properly the client's to make.

The charge is therefore dismissed.

*Charge dismissed.*