THIRD DIVISION
March 14, 2007

1-06-0254

| | | |
|---|---|---|
| TOWER INVESTORS, LLC, an Illinois Corporation, | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 02 L 004120 |
| 111 EAST CHESTNUT CONSULTANTS, INC., an | ) | |
| Illinois Corporation, and INVSCO GROUP, LTD., an | ) | |
| Illinois Corporation, | ) | Honorable |
| | ) | Allen S. Goldberg, |
| Defendants-Appellants. | ) | Judge Presiding. |

PRESIDING JUSTICE THEIS delivered the opinion of the court:

Following a bench trial, the circuit court of Cook County found that defendants, 111 East Chestnut Consultants, Inc. (Consultants), and Invsco Group, Ltd, its parent company (Invsco) (collectively defendants), had breached a contract with plaintiff, Tower Investors, LLC (Tower). That contract provided that in exchange for Tower's forbearance from suing Consultants for repayment of a $350,000 promissory note for roughly one year, Consultants, along with Invsco as guarantor, would repay the principal of the note (the forbearance agreement). The circuit court ordered defendants to pay Tower $350,000 in compensatory damages plus statutory interest from the date of the breach. Defendants now appeal, contending, in essence, that: (1) the law firm Sonnenschein, Nath & Rosenthal (Sonnenschein), of which most Tower members are partners, is an alter ego of Tower, and Tower breached the forbearance agreement when Sonnenschein sued defendants for attorney fees, thereby relieving defendants of performance of their obligations under the forbearance agreement; (2) the forbearance agreement is not an enforceable contract

because it was not supported by consideration; and (3) the forbearance agreement is not an enforceable contract because it was induced by fraud, specifically, Sonnenschein's failure to disclose that it had a conflict of interest with defendants by virtue of its simultaneous representation of defendants and investment in Consultants through Tower. For the following reasons, we affirm.

The record discloses the following relevant facts. Sonnenschein is a large, national law firm with its principal office in Chicago. Sonnenschein has roughly 250 partners. Sonnenschein has never been a party to this case.

Tower is a corporation formed by several Sonnenschein partners to enable them to make investments in client-related and other entities for a profit. Tower has been in existence in various corporate forms since the 1930s. The individuals who are members of Tower meet certain requirements, including that they are accredited investors. Tower's membership is also restricted to less than 100 members. At the time of trial, Tower had 75 or 80 members. Tower is managed by its own management committee, and Sonnenschein provides no direction to and has no relationship with Tower's management.

Invsco is a privately owned, billion-dollar real estate development firm, which develops condominiums in, not only Illinois, but several other states including Georgia, Florida, Indiana, and Texas. Invsco has developed 40 or 50 buildings in Chicago. Invsco formed Consultants in 1993 to convert an apartment building located at 111 East Chestnut Street in Chicago into condominiums. Invsco has been the sole shareholder of Consultants since its incorporation.

Tower commenced the present action when it filed a one-count breach of contract claim

against Consultants and Invsco alleging the following. In January 1995, Tower loaned $350,000 to Consultants for use in the condominium conversion of the 111 East Chestnut building. The loan and the terms of repayment were memorialized in a promissory note, which was due September 1, 1999. However, Consultants failed to make all of the required interest payments and failed to repay any of the principal.

In May 2000, Consultants requested that Tower enter into a forbearance agreement and conditional general release (the forbearance agreement), which modified the terms of the promissory note in the following ways. Consultants, along with Invsco as guarantor, agreed to reimburse Tower the principal of the loan, excluding any interest, by December 18, 2001. In exchange, Tower agreed not to prosecute any claims against Consultants, Invsco, or the condominium conversion project by not initiating any litigation in connection with the loan or the project prior to December 18, 2001.

Tower alleged that although it had performed its obligation to forbear, neither Consultants nor Invsco made any payment under the agreement. Accordingly, Tower sought $350,000 in damages plus statutory interest from December 18, 2001, and costs.

In their answer, defendants claimed that the forbearance agreement was not an enforceable contract between Tower and Invsco because there was no consideration. Defendants also denied that Tower performed its obligations under the forbearance agreement and denied that they breached it.

Tower subsequently filed a motion for summary judgment, arguing that defendants breached the forbearance agreement when they failed to repay the $350,000 principal before

December 18, 2001. In response, defendants reiterated that the agreement was unenforceable because there was no consideration flowing to Invsco. Defendants also claimed that Tower's forbearance was invalid because Tower knew that Consultants was insolvent at the time the agreement was made. In the alternative, defendants claimed that Tower was an alter ego of Sonnenschein and that Sonnenschein breached the forbearance agreement when it sued defendants for attorney fees for work Sonnenschein had performed on the 111 East Chestnut condominium conversion project and another unrelated project. The circuit court denied Tower's summary judgment motion.

The circuit court then conducted a bench trial. At that trial, Paul Miller, one of the managers of Tower, testified for Tower, detailing the circumstances of the $350,000 loan to Consultants. In summary, in the promissory note, which was dated February 10, 1995, Consultants agreed to repay Tower the $350,000 principal of the loan, plus 8% interest per annum, by September 1, 1999. The interest payments were to be paid monthly. Consultants made some of these interest payments, but never repaid the principal.

Sometime after the September 1, 1999, due date of the note, Miller asked Consultants about repayment. Consultants and Invsco then requested that Tower enter into the forbearance agreement. In December 2000, Tower ultimately decided to agree to it. Specifically, that agreement recognized that Tower had invested $350,000 in Consultants for the condominium conversion project and that Consultants and Invsco desired to reimburse Tower the principal amount of its investment. Accordingly, Consultants and Invsco agreed to repay Tower the $350,000 principal investment on or before December 18, 2001, provided that Tower observed

the forbearance undertaking. This required Tower not to:

> "Prosecute any claims against Consultants, [Invsco Group] Ltd., the [Chestnut Street Holdings, LLC] Company, or the [condominium conversion] Project, or their respective successors, assigns, shareholders, officers, employees, subsidiaries, affiliates, principals, agents, representatives and attorneys * * * including, without limitation, by not initiating any litigation prior to December 18, 2001, arising from or in connection with their Principal Investment or the Project."

On cross-examination, Miller added that defendants drafted the agreement. Miller signed the agreement on behalf of Tower. In a response to an interrogatory that was admitted into evidence during Tower's case-in-chief, defendants admitted that Steven E. Gouletas, a divisional president of both Invsco and Consultants, and the son of its chairman, Nicholas S. Gouletas, signed on defendants' behalf. However, neither Consultants nor Invsco repaid the principal by December 18, 2001.

Following the close of Miller's testimony and the reading of defendants' responses to two of Tower's interrogatories into the record, Tower rested its case-in-chief. For defendants, Wayne Hannah, who had been a partner at Sonnenschein for 47 years, testified as an adverse witness that Sonnenschein has represented Invsco and related entities for over 15 years. Hannah was also a member of Tower.

Sometime in late 1994 or early 1995, Mark Goldstein, the chief executive officer (CEO) of Invsco at the time, telephoned Hannah about the 111 East Chestnut project. Goldstein

informed Hannah that Invsco was in the process of acquiring the 111 East Chestnut building.

However, because Sonnenschein represented the seller of the building, and the seller would not

"give a waiver," Goldstein explained that Invsco could not hire Hannah to work on the purchase.

Nevertheless, Goldstein said that Nicholas Gouletas would like Hannah to handle the conversion

of the building from apartments to condominium ownership after the purchase had been

completed. Goldstein also told Hannah that Invsco was going to issue a private placement

memorandum to request capital investments in the project. Knowing that Hannah was also a

member of Tower, and that Tower had invested in approximately five other Invsco projects in the

past, Goldstein asked Hannah if he would submit the memorandum to the Tower management

committee to see if it was interested in investing in the project.

The private offering memorandum indicated that Consultants was seeking up to

$4,700,000 in participating notes, that would be due September 1, 1999. The private offering

memorandum also indicated that the offering involved a high degree of risk, including potential

conflicts of interest, and accordingly restricted participation in the offering to accredited

investors only. The memorandum also described the 111 East Chestnut building. Participating

notes were to be unsecured and to bear interest of 8% per annum. This memorandum was

drafted by outside counsel for Invsco and Consultants, from a firm other than Sonnenschein.

Tower agreed to invest $350,000 in Consultants for the project. Hannah believed this

occurred before he did any legal work on the project. A Tower investor's bulletin dated October

18, 1994, detailed the terms of the investment. Specifically, Tower invested $250,000 from its

liquid capital pool. However, because Tower was experiencing a shortage of liquid funds at that

time, the additional $100,000 was provided by Sonnenschein partners who were accredited investors and who "may or may not have been" members of Tower. Hannah also explained that this $100,000 was drawn on the particular partners' personal draw accounts, which contained funds owned by the individual partners but which were maintained by Sonnenschein.

Starting in early 1999, different people at Sonnenschein met with Mike Fish, the vice-president of Invsco, regarding payment of legal fees in matters other than the Tower investment. Hannah recalled personally asking Fish on several occasions whether Sonnenschein would be paid for the work that he had done. Hannah also spoke with Nicholas Gouletas starting in 1999 about the financial situation of Consultants. However, Hannah added on cross-examination that he personally never received the financial information he had requested. Hannah also said that there was no indication that Consultants' net worth was negative at that time.

Subsequently, defendants sent a letter to all investors in Consultants indicating that their principal investment would not be returned unless they signed the enclosed forbearance agreement. The letter and the forbearance agreement were written by Invsco's general counsel, Tony DeBenedetto. Tower, as one of Consultants' investors, received this letter and the agreement. Neither Tower nor Sonnenschein had any part in drafting the forbearance agreement, and at no point did any representative of defendants indicate that the forbearance agreement was also meant to include the legal fees that defendants owed to Sonnenschein. Tower did not sign the agreement immediately. When it did decide to sign the agreement in December 2000, no changes had been made to the original document drafted by DeBenedetto.

On December 26, 2000, Hannah returned the forbearance agreement, signed by the

relevant directors of Tower, to Nicholas Gouletas. A letter that Hannah sent to Gouletas along with Tower's signed copy of the forbearance agreement indicated that "Mike Fish has promised payments of the amounts to Sonnenschein for legal fees by the end of January 2001." Hannah added that he was "hopeful that this timetable will prove realistic."

Hannah explained on cross-examination that Sonnenschein completed work on its last Invsco-affiliated legal project in April 1999. Beginning in 2000, Sonnenschein told Hannah that neither he nor the rest of the firm could perform any additional legal services for Invsco or related entities. Nevertheless, Hannah believed that he still had an attorney-client relationship with defendants throughout 2000. Hannah also never had any further meetings with Invsco regarding collection of fees. However, although Hannah was neither a partner of Sonnenschein, because of his age, nor a member of the management committee of Tower at the time, Hannah recommended to the Sonnenschein finance committee that they sue Consultants to collect the unpaid fees.

Sonnenschein did ultimately sue Invsco, Consultants, Nicholas Gouletas, and another Invsco entity for unpaid legal fees on August 10, 2001. On cross-examination, Hannah added that the majority of the fees sought in that suit were from projects other than the 111 East Chestnut project.

On December 5, 2001, Hannah wrote to Nicholas Gouletas and asked him if Tower could expect repayment of the $350,000 principal by December 18, 2001. Hannah reminded Gouletas that "[r]ecognizing your problems, we've accomodated you." However, defendants never paid Tower.

Paul Miller testified again as an adverse witness for defendants. He explained the origins of Tower, its purpose, and how it operated. Among other things, Miller emphasized that Tower was run by a management committee, which met roughly once a month and made the decisions about investments. Sonnenschein had no input in that committee, nor did Tower's management committee have any input in Sonnenschein's management. Daniel Swett, a corporate and securities lawyer for Sonnenschein and a member of Tower, also testified as an adverse witness and related substantially the same information about Tower.

Miller also described more of the circumstances surrounding the advent of the forbearance agreement. Specifically, he indicated that he received financial data regarding Consultants on May 16, 2000, from Nicholas Gouletas. This information indicated that Consultants' net worth was approximately $13 million while its liabilities were roughly $15 million; however, Miller believed that its value was more than Gouletas had disclosed. In addition, Consultants continued to operate, generate revenue, and pay bills. Miller also noted that the forbearance agreement was drafted by Invsco's general counsel and that it was not altered from the time it was proposed in late 1999 until it was entered into in late 2000. Miller was not aware of the fee dispute between Sonnenschein and defendants.

Mike Fish, vice-president of Consultants, testified that Hannah and Gouletas had been working together since the 1970s. When Fish joined Consultants in 1995, Hannah was working with both Consultants and Invsco. Fish explained that the 111 East Chestnut project was performing very poorly in the late 1990s because of unforseen construction costs and other expenses. At the time of trial, the project was operating at a $6 million loss.

Regarding the value of Consultants, Fish explained that although the net worth on a historical cost basis was negative, on a market value basis, it was not. This was because the value of the assets of the firm was more than the historical cost to acquire them. Regarding the forbearance agreement, Fish did not favor it because he did not believe it benefitted Invsco economically.

Nicholas Gouletas, the chairman and founder of Invsco, also testified for the defense. He provided background detail about Invsco and Consultants. Gouletas explained that he had known Hannah for over 30 years, and Hannah had worked on anywhere between 30 and 50 of Gouletas's projects. Regarding defendants' alter ego claim, Gouletas added that he believed Sonnenschein and Tower were one and the same.

Following the trial, the court announced its findings of fact and conclusions of law in a written memorandum. Specifically, the court found that there was valid consideration to support the forbearance agreement because Consultants had assets and was operating at the time of the agreement. The court further found that Tower's forbearance was sufficient to bind both defendants because Invsco's guaranty was executed contemporaneously with Consultants' promise to pay. Regarding defendants' anticipatory breach claim, the court found that Sonnenschein was not an alter ego of Tower; therefore, Sonnenchein was not bound by the forbearance agreement. Thus, the court held that Consultants and Invsco had breached the forbearance agreement and awarded Tower $350,000 in damages plus statutory interest from the date of the breach.

Subsequently, defendants filed a motion to vacate the judgment. Therein, they claimed

that Sonnenschein was Tower's alter ego and that Sonnenschein's actions in suing defendants for legal fees constituted a breach of the forbearance agreement. They also claimed that the forbearance agreement was unenforceable because it was unsupported by consideration and induced by fraud, namely the conflict of interest between Sonnenschein and Tower. The court denied defendants' motion. Defendants then filed this timely appeal.

We will address defendants' arguments on appeal in a logical order. We will first address defendants' arguments regarding whether the forbearance agreement was a valid, enforceable contract because that is the threshold issue in this appeal. See, e.g., Zirp-Burnham, LLC v. E. Terrell Associates, Inc., 356 Ill. App. 3d 590, 600, 826 N.E.2d 430, 439 (2005) (observing that the first element of a breach of contract claim is the existence of a valid, enforceable contract). Specifically, defendants claim that the forbearance agreement is unenforceable for two reasons: (1) it is void because it was not supported by consideration and (2) it is voidable because it was induced by fraud. We must note that if either of these arguments were to prevail, only Invsco would be absolved of liability because the original January 1995 promissory note agreement would remain in effect.

Regarding defendants' allegations that the forbearance agreement is void and unenforceable, defendants claim that the consideration supporting it fails for two reasons. Defendants first claim that Tower's forbearance from suit against Consultants was insufficient consideration to bind Invsco. Defendants also claim that Tower knew that Consultants was insolvent at the time; therefore, Tower's forbearance was invalid because it knew the debt under the note was uncollectible. We will address each argument separately.

11

Included among the elements of an enforceable contract are: (1) offer and acceptance; (2) definite and certain terms; (3) consideration; and (4) performance of all required conditions. Zirp-Burnham, 356 Ill. App. 3d at 600, 826 N.E.2d at 439. Consideration means a bargained-for exchange of promises or performance. Village of South Elgin v. Waste Management of Illinois, Inc., 348 Ill. App. 3d 929, 940, 810 N.E.2d 658, 669 (2004). Forbearance, including the compromise of a disputed claim or a promise to forgo legal action, is also consideration. F.H. Prince & Co. v. Towers Financial Corp., 275 Ill. App. 3d 792, 798-99, 656 N.E.2d 142, 147 (1995).

Here, in the forbearance agreement, Invsco agreed to assume an obligation to repay Consultants' debt of $350,000, excluding interest, to Tower. Thus, Invsco's role in the forbearance agreement is a guaranty because it is a promise to pay Consultants' debt to Tower. Town & Country Bank of Quincy v. E & D Bankshares, Inc., 172 Ill. App. 3d 1066, 1073, 527 N.E.2d 637, 641 (1988).

Generally, a guaranty must be supported by consideration just as any other contract would be. Restatement (Third) of Suretyship and Guaranty §9 (1996). Significantly, the consideration flowing to the guarantor does not have to render a personal benefit to the guarantor. Restatement (Third) of Suretyship and Guaranty §9, Illustration 1, at 35 (1996) ("C agrees to lend D $1,000 if S will guarantee D's obligation to C. Following S's execution of a written guaranty, C makes the loan. S's guaranty is supported by consideration even though S receives no direct benefit from the loan"). A promise based on consideration to benefit a third person constitutes sufficient consideration to bind the guarantor. Lauer v. Blustein, 1 Ill. App. 3d 519, 521, 274 N.E.2d 868,

869-70 (1971).

Typically, the consideration supporting the underlying obligation will also support the guaranty. Restatement (Third) of Suretyship and Guaranty §9, Comment a, Illustration 1, at 35 (1996). In those circumstances, no separate consideration flowing to the guarantor is necessary. Restatement (Third) of Suretyship and Guaranty §9, Comment a, at 35 (1996); see also City National Bank of Hoopeston v. Russell, 246 Ill. App. 3d 302, 307, 615 N.E.2d 1308, 1312 (1993). However, where the guaranty is executed after the underlying obligation has been entered into, new consideration becomes necessary to support it. Russell, 246 Ill. App. 3d at 307, 615 N.E.2d at 1312.

Here, the circuit court found that Invsco's guaranty was executed contemporaneously with the original obligation of indebtedness. However, this conclusion is against the manifest weight of the evidence. The record is clear, and the parties do not dispute, that the $350,000 debt arose from a February 10, 1995 promissory note, while the parties did not enter into the forbearance agreement, in which Invsco guaranteed Consultants' debt to Tower, until December of 2000. Thus, the guaranty was not executed contemporaneously with the underlying obligation of indebtedness. We accordingly reverse the trial court's finding in this regard. See Chicago Transparent Products, Inc. v. American National Bank & Trust Co., 337 Ill. App. 3d 931, 940, 788 N.E.2d 23, 30 (2002).

Because the guaranty was executed after the guaranteed debt was incurred, new consideration was necessary to support it. Russell, 246 Ill. App. 3d at 307, 615 N.E.2d at 1312. Invsco claims that its guaranty of Consultants' preexisting debt to Tower is unenforceable

because Invsco personally received no benefit from the forbearance agreement. This is simply incorrect. As we explained above, Invsco itself did not need to receive a direct benefit for its written guaranty to be enforceable. Lauer, 1 Ill. App. 3d at 521, 274 N.E.2d at 869-70. Rather, to be enforceable, there had to be some exchange of new consideration between the parties that modified the terms of the original loan agreement to make the guaranty enforceable. Finn v. Heritage Bank & Trust Co., 178 Ill. App. 3d 609, 611-12, 533 N.E.2d 539, 542 (1989). Because forbearance is valid consideration, Tower's forbearance from exercising its right to take legal action against Consultants constitutes adequate consideration to support Invsco's guaranty of Consultants' preexisting debt. See, e.g., F.H. Prince, 275 Ill. App. 3d at 799, 656 N.E.2d at 148 (holding that plaintiff's forbearance from suit against subsidiary was sufficient consideration to support defendant's guaranty of defendant's subsidiary's preexisting debt); Finn, 178 Ill. App. 3d at 612, 533 N.E.2d at 542 (holding that consideration for guaranty of loan previously made was that guarantor's friend, the bank manager who issued the loan, would not lose his job for making a bad loan). Therefore, defendants' assertion that Tower's forbearance was insufficient consideration to bind Invsco to the forbearance agreement is incorrect.

We now turn to defendants' other argument regarding the consideration supporting the forbearance agreement. Defendants claim Tower's forbearance was insufficient to support the agreement because Tower knew that Consultants was insolvent, meaning that the $350,000 debt was uncollectible. We disagree.

An entity is insolvent if the sum of its debts is greater than the fair valuation of all of its assets, and an entity is presumed to be insolvent if it is unable to pay its debts as they fall due or

1-06-0254

in the ordinary course of business. 740 ILCS 160/3 (West 2004); Gray v. Mundelein College, 296 Ill. App. 3d 795, 806, 695 N.E.2d 1379, 1387 (1998); Black's Law Dictionary 799 (7th ed. 1999). When an entity is insolvent, a debt that it owes is uncollectible; therefore, to forbear from suing an insolvent entity does not constitute a legal detriment. F.H. Prince, 275 Ill. App. 3d at 799, 656 N.E.2d 147-48. Here, the circuit court found that Consultants was not insolvent because at the time that the forbearance agreement was created, Consultants was still operating, generating revenue, paying bills, and holding assets. It continued to do so through the time of trial. In addition, Fish's and Miller's testimony established that the fair market valuation of Consultants' assets was greater than its indebtedness. Because the circuit court's finding that Consultants was not insolvent is not against the manifest weight of the evidence, we decline to reverse it here. See Chicago Transparent Products, Inc. v. American National Bank & Trust Co., 337 Ill. App. 3d 931, 940, 788 N.E.2d 23, 30 (2002).

Moreover, even if Consultants were actually insolvent at the time, in the present case, it would not change our conclusion. Where a party's compromise of its claim is made in good faith, even if that claim is ultimately shown to be invalid, the forbearance is nevertheless sufficient consideration to support a contract. F.H. Prince, 275 Ill. App. 3d at 801, 656 N.E.2d at 149. Here, the record does not indicate that Tower's forbearance was not made in good faith. Both Miller and Hannah testified that they believed that Consultants was not insolvent. Thus, defendants' claims that the forbearance agreement lacked consideration fails.

Defendants' second claim regarding the enforceability of the forbearance agreement is that it is voidable because it was induced by fraud. Specifically, defendants claim that Tower

15

fraudulently induced them to sign the forbearance agreement in two respects. First, they claim that Tower failed to disclose that Sonnenchein intended to sue defendants for legal fees. Second, they claim that Sonnenschein and its partners suffered from a conflict of interest due to their simultaneous representation of defendants and investment in Consultants via Tower.

Fraud in the inducement of a contract is a defect which renders the contract voidable at the election of the innocent obligor. Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co., 355 Ill. App. 3d 156, 164, 821 N.E.2d 706, 712-13 (2004). This means that although the perpetrator of the fraud cannot enforce a voidable contract, the innocent obligor may either seek to rescind the contract or choose to waive the defect, ratify the contract, and enforce it. Illinois State Bar Ass'n Mutual Insurance Co., 355 Ill. App. 3d at 164-65, 821 N.E.2d at 713. In order for a misrepresentation to constitute fraud that would permit a court to set aside a contract, the party seeking to do so must establish that there was " 'a representation in the form * * * of a material fact, made for the purpose of inducing a party to act; it must be false and known by the party making it to be false, or not actually believed by him, on reasonable grounds, to be true; and the party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely on the truth of the statement.' " James v. Lifeline Mobile Medics, 341 Ill. App. 3d 451, 456, 792 N.E.2d 461, 465 (2003), quoting Wilkinson v. Appleton, 28 Ill. 2d 184, 187, 190 N.E.2d 727, 729-30 (1963).

Here, defendants' claim that they were fraudulently induced to enter into the forbearance agreement is belied by the record in two respects. First, the record shows that defendants, not Tower, requested that Tower enter into the forbearance agreement. Second, Tower made no false

16

statements or attempted to conceal any conflict of interest from defendants. Rather, Mark Goldstein, the CEO of Invsco at the time, called Wayne Hannah personally and invited him into the arrangement. Goldstein specifically asked Hannah to simultaneously invest in the project through Tower and perform legal services for the condominium conversion aspect of the project through Sonnenschein. Goldstein told Hannah that Nicholas Gouletas had personally requested this arrangement. In addition, this was not the first time that Invsco and Hannah had worked together in this manner. Hannah had been providing legal services for Gouletas for over 30 years and had worked on anywhere between 30 and 50 of his projects. Over the past 15 years, while Hannah was a member of Tower, Tower had invested in approximately five other Invsco projects. Thus, the directors of defendants were fully aware of Hannah's background and the fact that certain Sonnenschein partners who performed legal services for them were also creditors of Consultants by virtue of their investment in Consultants through Tower. Because defendants created this situation with full knowledge of the dual nature of Hannah's roles, they cannot now claim that they were fraudulently induced to do anything as a result of their actions. Thus, the forbearance agreement is a valid, enforceable contract.

We now turn to defendants' primary argument on appeal. They contend that they should not be held liable for breach of contract because Tower breached the forbearance agreement first when Sonnenschein, which it claims is an alter ego of Tower, sued defendants for unpaid attorney fees related to the 111 East Chestnut project and at least one other project. Defendants therefore claim that they are relieved of performance of their obligations under the forbearance agreement. Thus, although defendants do not provide the legal framework for such an argument,

their theory is, in essence, a defense of anticipatory breach.

An anticipatory breach, also called anticipatory repudiation, is a manifestation by one party to a contract of an intent not to perform its contractual duty when the time comes for it to do so even if the other party has rendered full and complete performance. In re Marriage of Olsen, 124 Ill. 2d 19, 24, 528 N.E.2d 684, 686 (1988); Podolsky & Associates, L.P. v. Discipio, 297 Ill. App. 3d 1014, 1023, 697 N.E.2d 840, 846 (1998). When one party anticipatorily breaches a contract, the non-breaching party generally has three options: (1) to rescind the contract altogether and pursue the remedies based on the rescission; (2) to elect to treat the repudiation as an immediate breach by bringing suit or by making some change in position; or (3) to await the time for performance of the contract and bring suit after that time has arrived. 23 R. Lord, Williston on Contracts §63:33, at 561 (4th ed. 2002); see also Builder's Concrete Co. v. Fred Faubel & Sons, Inc., 58 Ill. App. 3d 100, 103, 373 N.E.2d 863, 867 (1978). Put another way, when one party repudiates a contract, the nonrepudiating party is excused from performing (see, e.g., Curtis Casket Co. v. D.A. Brown & Co., 259 Ill. App. 3d 800, 806, 632 N.E.2d 204, 209 (1994)) or may continue to perform and seek damages for the breach. Yale Development Co. v. Aurora Pizza Hut, Inc., 95 Ill. App. 3d 523, 526, 420 N.E.2d 823, 825 (1981); 23 R. Lord, Williston on Contracts §63:33, at 561-62 (4th ed. 2002). In addition, if the party who repudiated the contract subsequently sues the non-repudiating party for failing to perform, the plaintiff's repudiation is a defense. 23 R. Lord, Williston on Contracts §63:37, at 571 (4th ed. 2002).

Here, defendants' theory of anticipatory breach depends upon treating Tower and Sonnenschein as one and the same entity. We must observe that at no point in this litigation have

the parties, or even the circuit court, engaged in a discussion about whether the equitable doctrine of piercing the corporate veil can be used in these circumstances. In essence, defendants seek to use the theory as a means to defend a breach of contract action by imputing the conduct of one business entity, Sonnenschein, to another allegedly related entity, Tower.

At oral argument, we asked the parties to submit supplemental briefs on this issue. Responding to our request, defendants cite two cases applying an "alter ego defense," a 43-year-old case from Tennessee (Neese v. Fireman's Fund Insurance Co., 53 Tenn. App. 710, 386 S.W.2d 918 (1964)) and a Sixth Circuit Court of Appeals case applying Tennessee law (Federal Deposit Insurance Corp. v. Aetna Casualty & Surety Co., 947 F.2d 196 (6th Cir. 1991)). However, those cases are not about a "mere defensive application of [the] veil piercing doctrine" based on common law. Bird v. Centennial Insurance Co., 11 F.3d 228, 232 n.6 (1st Cir. 1993). Rather, the "alter ego defense" discussed in those cases is a defense derived from the language of specific insurance policies at issue, under which no coverage is available for the acts of an "alter ego" of the insured. Bird, 11 F.3d at 232 n.6. In that context, the term "alter ego" is used to refer to a dominant corporate officer. Bird, 11 F.3d at 232. To allow the corporation to recover under a policy for the fraudulent acts of the corporation's dominating personality, which are essentially the corporation's own fraudulent acts, would be contrary to public policy. Bird, 11 F.3d at 233 n.7. That is not the case here.

Accordingly, we decline to follow the authority cited by defendants and express no opinion as to whether the equitable doctrine of piercing the corporate veil may be used in this situation. Nevertheless, we find that even if the doctrine could be employed as a means to

19

impute Sonnenschein's actions to Tower in order to defend against Tower's breach of contract

suit, the circumstances here would still not warrant piercing the corporate veil.

In general, the law regards a corporation as an entity separate and distinct from its

officers, shareholders, and directors, and those parties will not be held personally liable for the

corporation's debts and obligations. Melko v. Dionisio, 219 Ill. App. 3d 1048, 1063, 580 N.E.2d

586, 594 (1991). However, in certain circumstances, the corporate form may be disregarded,

such as where the corporation is merely the alter ego or the business conduit of another

dominating personality. Melko, 219 Ill. App. 3d at 1063, 580 N.E.2d at 594. Notably, although

usually it is the corporate veil between the parent corporation and its subsidiary that is pierced,

courts may also pierce the corporate veil between two affiliated, or "sister," corporations. Main

Bank of Chicago v. Baker, 86 Ill. 2d 188, 205, 427 N.E.2d 94, 101 (1981).

"Piercing [the] corporate veil is a task which courts should undertake reluctantly."

Pederson v. Paragon Pool Enterprises, 214 Ill. App. 3d 815, 819, 574 N.E.2d 165, 167 (1991).

The court should not interfere with the corporate form anymore than it would a private contract,

and the corporate veil should only be pierced when it appears that something in the particular

situation has "gone amiss." 1 W. Fletcher, Cyclopedia of Corporations §41, at 557 (1999).

Particularly, in breach of contract cases, courts should apply even more stringent standards to

determine when to pierce the corporate veil than they would in tort cases. 1 W. Fletcher,

Cyclopedia of Corporations §41.85, at 692 (1999). "This is because the party seeking relief in a

contract case is presumed to have voluntarily and knowingly entered into an agreement with a

corporate entity, and is expected to suffer the consequences of the limited liability associated

1-06-0254

with the corporate business form." 1 W. Fletcher, Cyclopedia of Corporations §41.85, at 692 (1999).

Illinois courts will pierce the corporate veil where: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances. Pederson, 214 Ill. App. 3d at 819-20, 574 N.E.2d at 167. In a breach of contract case, " 'additional compelling facts,' " such as a finding of fraud, may also be required. Baker, 86 Ill. 2d at 205-06, 427 N.E.2d at 101-02.

Where there is no evidence of any misrepresentation, no attempt to conceal any facts, and the parties possess a total understanding of all of the transactions involved, Illinois courts will not pierce the corporate veil in a breach of contract situation. Baker, 86 Ill. 2d at 205, 427 N.E.2d at 102. For example, in Baker, two affiliated corporate entities conducted an equipment purchase through a "straw man," which was comprised of two individuals who owned 20% of the stock of one corporation. That corporation loaned money to the straw man, then the straw man leased the equipment back to the affiliate. The first corporate entity subsequently sued the straw man for breach of the loan agreement. Baker, 86 Ill. 2d at 194-96, 427 N.E.2d at 96-97.

However, the supreme court refused to allow the straw man to raise a counterclaim seeking to pierce the corporate veil of the affiliate corporation, which was not making lease payments, and impute its conduct to the plaintiff corporation. Baker, 86 Ill. 2d at 205, 427 N.E.2d at 102. Specifically, the court found that there was no evidence of misrepresentation of any kind, no one attempted to deceive the defendants or conceal anything under corporate names,

21

and the defendants, who were represented by counsel at the time the transactions were made, had a total understanding of them. Baker, 86 Ill. 2d at 205, 427 N.E.2d at 102. Significantly, the court observed that one "cannot assert the equitable doctrine of piercing the corporate veil to disregard the separate corporate existence of a corporation he himself created to gain an advantage which would be lost under his present contention." Baker, 86 Ill. 2d at 206, 427 N.E.2d at 102.

Here, we find that even if defendants could have shown the requisite unity of interest and ownership, the circumstances in this case are not such that adherence to the fiction of separate entities would promote injustice or inequity. Wayne Hannah testified that Mark Goldstein, the president of Invsco at the time, called him personally to ask him if Tower would be interested in investing money in the 111 East Chestnut project. Goldstein also asked Hannah if he would like to perform the legal services necessary to convert the building to condominium ownership once Consultants' purchase of the building was complete, understanding that Hannah could not assist Consultants with the purchase because of a conflict of interest.

Thus, defendants created the present situation with full knowledge of the relationship between Tower, its members, and Sonnenschein. Nothing had "gone amiss" in the present situation that would have led to an injustice. See 1 W. Fletcher, Cyclopedia of Corporations §41, at 557 (1999). Because the fraud or inequity that the alter ego doctrine aims to protect against must be that of "the party against whom the doctrine is invoked and the party must have been an actor in the course of conduct constituting the abuse of corporate privilege" (1 W. Fletcher, Cyclopedia of Corporations §41.20, at 596 (1999)), defendants cannot claim that it was Tower's

22

actions which caused them harm.

Further, defendants created this situation for their own benefit. It enabled them to finance their project and obtain the necessary legal services to complete it. As the supreme court observed in Baker, we find that they should not now be able to assert the equitable doctrine of piercing the corporate veil to circumvent a situation from which they benefitted. Baker, 86 Ill. 2d at 206, 427 N.E.2d at 102.

Finally, the record contains neither evidence of any misrepresentations by Tower and Sonnenschein, nor evidence that Tower and Sonnenschein tried to conceal any facts from defendants. See Baker, 86 Ill. 2d at 205, 427 N.E.2d at 102. In fact, as Hannah's December 26, 2000 letter to Gouletas illustrates, Tower did not believe that its entry into the forbearance agreement affected the payment of legal fees to Sonnenschein. Rather, Hannah expressed his belief that the matter of Tower's loan and Sonnenschein's fees were proceeding under two separate timetables.

The fact that this situation involved an attorney-client relationship does not change this conclusion. Defendants argue, based on both contract and disciplinary law, that because Tower was comprised of attorneys including Hannah, Tower's actions essentially amounted to attorneys investing in their client's project while rendering legal advice. Defendants maintain that Sonnenschein's failure to make an affirmative disclosure of this dual role amounted to a fraud or injustice sufficient to warrant piercing the corporate veil. We disagree.

According to principles of contract law, attorney-client transactions are not void, but rather, presumptively fraudulent. Monco v. Janus, 222 Ill. App. 3d 280, 293, 583 N.E.2d 575,

1-06-0254

583 (1991). This presumption stems from a public policy against attorneys using their position of trust and power to take unfair advantage of clients in transactions. Monco, 222 Ill. App. 3d at 293, 583 N.E.2d at 583. However, an attorney can overcome the presumption of undue influence with clear and convincing evidence showing that: (1) the attorney made a full and frank disclosure of all relevant information; (2) the attorney gave adequate consideration; and (3) the client had independent advice before completing the transaction. Monco, 222 Ill. App. 3d at 291, 583 N.E.2d at 581-82.

Similarly, under the Illinois Rules of Professional Conduct:

"(A) Unless the client has consented after disclosure, a lawyer shall not enter into a business transaction with the client if:

(1) the lawyer knows or reasonably should know that the lawyer and the client have or may have conflicting interests therein. " 134 Ill. 2d R. 1.8.

Where an attorney makes a disclosure of the conflict, and the client has independent advice, the supreme court has declined to discipline attorneys under this rule. In re Barrick, 87 Ill. 2d 233, 239-40, 429 N.E.2d 842, 846 (1981) (imposing no discipline where attorney, who drafted will giving himself a $12,000 annuity from a client, described as a "sharp" widow who was "not easily taken advantage of," because there had been disclosure and independent advice).

Here, defendants are not raising a claim of undue influence or requesting that Hannah be disciplined. Thus, neither of the above analyses is directly applicable. However, even using them as a guideline to determine whether defendants have been the victims of any

24

misrepresentation, fraudulent concealment, or even a misunderstanding, we would find the present circumstances insufficient to warrant disregarding the separate existences of Tower and Sonnenschein for four reasons. First, as we have already discussed, defendants were well aware of the fact that Hannah was a creditor of Consultants by virtue of Tower's loan while he was performing the legal services necessary to convert the building to condominium ownership. Defendants were also aware of when conflicts of interest become a problem for an attorney. When Mark Goldstein asked Hannah to propose the investment opportunity to Tower and to perform the condominium conversion, he also told Hannah that Hannah could not assist defendants with the purchase of the building because Sonnenschein was already representing the seller of the building and the seller would not waive the conflict. Thus, although Hannah himself did not make any affirmative disclosure of the conflict, Invsco and Hannah had transacted business in this manner in the past, and Invsco had to be fully aware of the duality of Hannah's position and the potential problems involved therewith.

Second, defendants had their own general counsel draft the forbearance agreement and offer it to the entire class of investors of which Tower was a part. Evidence that a client received independent legal advice is a very compelling means of rebutting a presumption of undue influence. In re Schuyler, 91 Ill. 2d 6, 16, 434 N.E.2d 1137, 1142 (1982). In addition, it is unlikely that Hannah, a real estate attorney, would have been able to exercise undue influence over defendants in connection with a form contractual agreement that was drafted and offered to him by defendants' counsel.

Third, as we discussed above at length, the forbearance agreement was supported by

25

adequate consideration. Invsco's guaranty and Consultants' renewed promise to pay were supported by Tower's forbearance and agreement to forgo unpaid interest. Finally and perhaps most importantly, defendants are very sophisticated parties and unlikely to be taken advantage of. Invsco is a billion-dollar corporation, much more sophisticated than most other types of clients that an attorney would encounter. See, e.g., Barrick, 87 Ill. 2d at 239-40, 429 N.E.2d at 846. Accordingly, based on the circumstances present here, the transaction in question cannot be said to have been the product of any misrepresentation, fraudulent concealment, or other misunderstanding on the part of defendants.

Therefore, defendants cannot employ the theory of piercing the corporate veil here, and Sonnenschein's actions in suing defendants for attorney fees prior to December 18, 2001 cannot be considered an anticipatory breach of the forbearance agreement. Thus, defendants' defense fails, and we affirm the trial court's judgment awarding Tower damages for defendants' failure to perform their obligations under the forbearance agreement.

Affirmed.

GREIMAN and KARNEZIS, JJ., concur.

**TOWER INVESTORS, LLC, an Illinois Corporation,**

    **Plaintiff-Appellee,**

    **v.**

**111 EAST CHESTNUT CONSULTANTS, INC., an Illinois Corporation, and INVSCO GROUP, LTD., an Illinois Corporation,**

    **Defendants-Appellants,**

## No. 1-06-0254

**Appellate Court of Illinois**
**First District, Third Division**

**Filed: March 14, 2007**

### PRESIDING JUSTICE THEIS delivered the opinion of the court.

**Greiman and Karnezis, JJ., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable Allen S. Goldberg, Judge Presiding**

| | |
|---|---|
| **For DEFENDANTS - APPELLANTS** | **Kristi L. Browne**<br>**The Patterson Law Firm, P.C.**<br>**33 N. LaSalle St., Suite 3350**<br>**Chicago, IL 60602** |
| **For PLAINTIFF - APPELLEE** | **Fred E. Schulz**<br>**R. Michael McCann**<br>**Wildman, Harrold, Allen & Dixon, LLP**<br>**225 W. Wacker Dr., Suite 2800**<br>**Chicago, IL 60606** |