2017 IL App (1st) 161949

FIRST DIVISION
December 29, 2017

No. 1-16-1949

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| A.L. DOUGHERTY REAL ESTATE MANAGEMENT COMPANY, LLC, and PHYLLIS K. DOUGHERTY, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 13 L 3920 |
| SU CHIN TSAI and CUBE GLOBAL, LLC, | ) ) | The Honorable Patrick Sherlock, |
| Defendants-Appellants. | ) | Judge Presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justices Simon and Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1   In 2011, plaintiffs obtained a default judgment against March Fasteners, Inc. (March), a company owned by Su Chin Tsai, for breaching a commercial lease (the underlying action). Plaintiffs subsequently learned that while the underlying action was pending, March agreed to sell certain assets to Cube Global, LLC, a company formed by Tsai's 16-year-old daughter. Plaintiffs initiated this action, alleging in relevant part that Cube Global was the alter ego of March, that Tsai and Cube Global were liable to plaintiffs for March's purported transfer of assets to Cube Global pursuant to section 5(a)(1) of the Uniform Fraudulent Transfer Act (Fraudulent Transfer Act) (740 ILCS 160/5(a)(1) (West 2012)), and that Tsai conspired with

others to prevent plaintiffs from collecting on the default judgment obtained in the underlying action. Following a bench trial, the circuit court entered judgment in favor of plaintiffs.

¶ 2    On appeal, defendants argue that the circuit court erred because it (1) entered judgment in favor of plaintiffs on a non-existent "stand-alone" cause of action for alter ego liability, (2) misapplied the law of veil piercing, (3) admitted certain documents into evidence without an adequate foundation, (4) permitted plaintiffs' expert to testify at trial to an undisclosed opinion, and (5) denied defendants' request for an evidentiary hearing on plaintiffs' attorney fees petition. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4    In March 2002, March, a company in the business of importing and distributing metal fasteners, nuts, bolts, and screws to wholesale distributors, entered into a five-year commercial lease with plaintiffs to rent space in plaintiffs' Elk Grove Village warehouse, commencing on April 1, 2002, and ending May 31, 2007. Tsai executed the lease on behalf of March. March and plaintiffs later extended the Elk Grove Village warehouse lease through May 31, 2009.

¶ 5    On September 9, 2008, Tsai incorporated Matrix International, Inc., listing herself on the articles of incorporation as Matrix's sole incorporator and initial registered agent. Matrix's initial registered office was 2969 Burlington Avenue, Lisle, Illinois, which was Tsai's home address at the time. On October 3, 2008, Tsai, in her capacity as the president of Matrix, executed a real estate purchase agreement and closing statement for a building located at 1966 Quincy Court, Glendale Heights, Illinois (the Matrix building). On December 31, 2008, March moved out of the Elk Grove Village warehouse and into the Matrix building. March and Matrix executed a commercial lease agreement for a term ending on December 31, 2011. Tsai signed the lease on behalf of Matrix.

¶ 6 In April 2009, plaintiffs initiated the underlying action. March appeared through counsel but its counsel later withdrew, and no additional appearance was filed on behalf of March. On June 22, 2011, the circuit court entered a default judgment in favor of plaintiffs for $281,462.32, plus attorney fees, costs, and postjudgment interest (the underlying judgment). Through supplemental proceedings, plaintiffs only collected $3264.02 in satisfaction of the underlying judgment, leaving a balance of $278,198.30.

¶ 7 Meanwhile, on October 20, 2010, Cube Global was formed. Tsai's 16-year-old daughter Li-Yen Tu (Vicky) was listed on the articles of organization as Cube Global's organizer and registered agent, with Cube Global's principal place of business listed as 1966 Quincy Court, the address of the Matrix building. Tsai was Cube Global's sole manager from inception until sometime in 2012, when Yu-Chia Huang became a co-manager of Cube Global.[1]

¶ 8 On November 1, 2010, Tsai sent a letter to March's clients and vendors that stated:

> "As our letterhead indicates, we have a new name. The business you knew as March Fasteners, Inc. is becoming Cube Global, LLC. This change will take effect on November 8, 2010.
>
> There has been no change in management and we will be providing more products and services under the new company. We would appreciate it if you would bring this announcement to the attention of your accounts [receivable/payable] department and direct them accordingly."

At trial, Tsai acknowledged that she failed to disclose these letters during pretrial discovery.

---

[1]The actual ownership of Cube Global was a disputed issue at trial. Defendants asserted that Cube Global was owned by Xiaoyu Fang (who is Tsai's niece's husband) and Huang. Neither Fang nor Huang gave depositions in this case, nor did defendants call either of them to testify at trial.

¶ 9    On November 5, 2010, Tsai executed a sales agreement on behalf of March in which March agreed to sell "certain assets" to Cube Global itemized in a 42-page exhibit to the sales agreement. On its face, the sales agreement indicated that Cube Global agreed to pay $400,000 "(plus or minus 10%) for Inventory which is including [*sic*] packaging, outstanding, confirmed sales orders and sales software." Cube Global agreed to pay within 60 days after receiving March's assets.

¶ 10   Cube Global began operating on November 8, 2010. It operated out of the same space that March occupied on November 5, 2010. Tsai testified that March did not close its doors right away, and there was a period of time when March's employees worked for both March and Cube Global. Cube Global continued to use March's vendors and customer codes on its invoices. All of March's employees eventually became employees of Cube Global. Cube Global's employees worked from the same desks with the same phone numbers and used the same software that March had used. Cube Global executed a lease for the Matrix building, which commenced on January 1, 2011, and expired on March 31, 2014.

¶ 11   On April 17, 2013, plaintiffs initiated this action seeking to hold Tsai and Cube Global liable for the underlying judgment against March, and for March's transfer of its assets to Cube Global. Relevant to the issues on appeal, count II of the second amended complaint alleged that Cube Global was the alter ego of March because it had acquired and assumed all of March's assets, customers, business operations, and employees, and because it failed to maintain arms-length transactions with March, Matrix, and Tsai. Count II further asserted that "[a]dherence to the fiction of March and Cube Global's separate corporate existences would *** promote a substantial injustice," and claimed that Cube Global was liable for the underlying judgment. In count III, plaintiffs alleged that both Cube Global and Tsai were liable to plaintiffs because

4

March's transfer of substantially all of its assets to Cube Global was a fraudulent transfer under the section 5(a)(1) of the Act (740 ILCS 160/5(a)(1) (West 2012)). Count IV alleged that Tsai aided and abetted the fraudulent transfer, and count V alleged that Tsai conspired with Xiaoyu Fang, Yu-Chia Huang, and Tsai's children, Vicky, Li-Jen Tu (Alex), and Li-Heng Tu (Eric), to "orchestrate [an] elaborate fraudulent scheme" that prevented plaintiffs from recovering the underlying judgment from March.

¶ 12    At trial, plaintiffs sought to establish that March transferred its assets to Cube Global without receiving reasonably equivalent value in exchange. Plaintiffs called Michael Pakter, a certified public accountant, as an expert witness in the field of forensic accounting.[2] Pakter testified that on and after November 5, 2010, virtually all of March's assets were transferred to Cube Global, including inventory, accounts receivable, "all of the asset infrastructure, the business economic infrastructure of March, the employees, and assembled work force, the customer relationships, the vendor relationships, the leasehold interest, all of the goodwill, everything[.]" Pakter identified other assets that were transferred from March to Cube Global, including "pallets, furniture, fittings, computers, equipment, telephone equipment, the phone number, [and the] fax number. All of the infrastructure of March Fasteners was transferred over to Cube Global." Pakter testified that he had identified "hundreds of examples of orders placed, shipped and invoiced by March before November 5, 2010, to monies paid to and deposited by Cube Global on and after Monday, November 8, 2010." In total, Cube Global received $343,084 from March's accounts receivable. He further testified that after November 8, 2010, when Cube Global began operating out of the Matrix building, March paid $99,500 in rent due under the lease and no "reasonable equivalent value was given for the $99,500 of rent that was paid" by March to Matrix. Defendants objected to Pakter's testimony regarding the rent, arguing that his

---

[2]Defendants had no objection to Pakter's qualifications as an expert.

opinion regarding the value of the rent was not disclosed in his pretrial written report. The circuit court overruled defendants' objection. Pakter concluded that "March did not receive reasonably equivalent value for receivables, rent, and good will and other assets." Pakter did not place a value on the good will or other assets transferred.

¶ 13    Plaintiffs' evidence sought to establish the web of connections between Tsai, March, Matrix, and Cube Global, as well Tsai's financial control over those entities. We recite only those facts necessary to understand our disposition here.

¶ 14    In 2007, Tsai was the sole owner, secretary, and treasurer of March. Starting in February 2008, Tsai was also March's president and sole director. Tsai was the sole authorized signatory on all of March's bank accounts.

¶ 15    Tsai testified at her deposition that she never held a position as an officer, director, or owner of Matrix. Matrix's 2009 and 2010 annual reports, however, listed Tsai as its registered agent, President, and Secretary. The 2010 report additionally listed Tsai as Matrix's director, and Tsai signed the 2010 report as Matrix's President. In December 2010, Tsai opened a bank account for Matrix at JPMorgan Chase Bank, N.A. (Chase), and she was the only authorized signatory on the account. Matrix's principal address remained 2969 Burlington Avenue, which was Tsai's home address at the time. From Matrix's inception through July 2013, Tsai signed every one of Matrix's checks drawn on the Chase account. In August 2012, Tsai added her son Eric as an additional authorized signatory on the Chase account. The Chase documentation reflected that Tsai added Eric as a signatory in her capacity as president, despite Matrix's 2011 report reflecting that Chun Hsein Wu was Matrix's president. In his 2015 deposition, Eric stated that he was not familiar with Matrix prior to his deposition. The evidence showed that Tsai made

checks on the Matrix account to pay a water bill, homeowner's association dues, and a landscaping bill for her 2969 Burlington Avenue residence.

¶ 16    Plaintiffs' evidence established Tsai's involvement in the formation and capitalization of Cube Global, as well as her control over Cube Global's bank accounts. As stated above, on October 20, 2010, Tsai's 16-year-old daughter, Vicky, formed Cube Global listing herself as its organizer and registered agent with its principal place of business at the Matrix building. On November 2, 2010, Tsai opened a Cube Global business account at Chase with Tsai listed as Cube Global's manager and the only person authorized to sign checks or transact business on Cube Global's Chase account. On November 10, 2010, five days after the execution of the sales agreement between March and Cube Global, Eric (who was also 16-years-old at the time) issued a $100,000 check from a personal checking account jointly held by him and his mother payable to Cube Global. Eric testified that the $100,000 had been transferred to the joint account by Tsai, and that she directed him to issue the check to Cube Global because Xiaoyu Fang, who was Tsai's niece's husband, needed a loan. Tsai acknowledged that she transferred the $100,000 to Eric so that Eric could loan the money to Fang, whom Tsai claimed was the one who requested Cube Global's formation in the first place. Eric did not receive a promissory note for the $100,000 loan to Fang. On July 18, 2011, Eric issued another check for $18,000 to Cube Global from the joint checking account. Days before the check was issued, Tsai transferred $18,000 into the joint account from her personal checking account. In August 2012, Tsai added Eric as an additional authorized signatory on Cube Global's Chase account. Eric's sole involvement with Cube Global, however, was a two month internship in 2011.

¶ 17    The actual ownership of Cube Global was disputed at trial. Tsai testified that Fang "created" Cube Global, and claimed that Cube Global was owned by Fang and Huang. Tsai

could not recall if Fang had requested that Tsai file the articles of incorporation or if Fang requested an accountant to do so. Tsai testified that Cube Global had share certificates, which were admitted into evidence.[3] Tsai also testified that Fang and Huang kept minutes of Cube Global's meetings.[4] Tsai stated that she only spoke to Fang and Huang one or two times per year. According to Cube Global's 2010 tax returns, Fang made $198,077 in capital contributions, while Huang made $162,063 in capital contributions. Tsai testified that another Cube Global tax return showed that Fang and Huang made additional capital contributions of $53,450 and $43,732, respectively.[5] Tsai testified that these were cash contributions that were used to purchase inventory from China. Over plaintiffs' objection, the circuit court admitted into evidence a cash receipt from Cube Global's Chinese supplier, Morgan Hardware, for approximately $400,000, which was purportedly for the inventory purchased with Fang's and Huang's capital contributions. Tsai did not produce any evidence, however, to suggest that funds used to pay for the Chinese inventory were transferred from accounts owned or controlled by either Fang or Huang, or any other evidence to corroborate Tsai's testimony that Fang and Huang paid for the inventory. Neither Fang nor Huang testified at trial.

¶ 18    Finally, plaintiffs introduced evidence that between April 2011 and July 2011, Tsai transferred $961,000 from Cube Global's accounts into other accounts under Tsai's exclusive control. Plaintiffs established that between July 20, 2011, and July 22, 2011, Tsai transferred $966,000 from accounts under her control into Matrix's Chase account, for which she was also

---

[3]The three share certificates for Cube Global, dated October 20, 2010, reflected that Fang had a 40% ownership interest, Huang had a 35% ownership interest, and an individual named Pi-Tao Hung had a 25% ownership interest.

[4]Plaintiffs objected to the admission of the minutes from any meetings between Fang and Huang, since Tsai was not present for any of the meetings and thus could not lay a foundation for the minutes's admissibility. Plaintiffs further objected that Tsai had not produced the minutes prior to her deposition and had only produced them in the months before trial. The circuit court sustained plaintiffs' objections.

[5]The trial transcript refers to "Plaintiff's Exhibit 27," although we have not been able to locate that exhibit in the record on appeal.

the sole authorized signatory. On July 25, 2011, Tsai transferred $990,000 from Matrix's Chase account to an escrow trust account at Chicago Title and Trust Company in connection with the purchase of a house located at 1700 South Braymore Drive, Inverness, Illinois. The sale of the house in Inverness to Tsai closed on July 25, 2011, and Tsai was issued a warranty deed. Defendants objected to the admissibility of the escrow and closing documents into evidence, contending there was a lack of foundation showing Tsai's familiarity with her attorney's signature on the documents. The circuit court overruled the objections. Tsai testified that the home was purchased in her name and the loan was guaranteed by her husband, but that the property was subsequently transferred to her children. At the time of trial, Tsai resided at 1700 South Braymore Drive.

¶ 19    The parties submitted extensive written closing arguments addressing whether Cube Global was March's alter ego and therefore liable for the underlying judgment. On December 29, 2015, the circuit court entered a written order discussing the principles of corporate successor non-liability and the exceptions thereto. The circuit court concluded that Cube Global was the alter ego and mere continuation of March. The circuit court found that March and Cube Global had the same ownership and the "two businesses were one and the same." The circuit court concluded that Cube Global was liable for the underlying judgment, including attorney fees as provided for under March's lease. Next, the circuit court found that Cube Global was liable to plaintiffs under the Fraudulent Transfer Act in the amount of $435,584 because it received $343,084 from March's accounts receivable and $92,500[6] in rent paid by March to Matrix, without providing March with reasonably equivalent value in exchange. The circuit court found,

---

[6]The circuit court's order found that "Cube Global received $92,500 in free rent that was actually paid by March." Pakter's testimony at trial was that Cube Global received $99,500 in rent that was paid by March to Matrix. Neither party on appeal addresses this discrepancy, or provides any insight as to why the circuit court did not award plaintiffs an amount consistent with Pakter's testimony.

however, that Tsai was not personally liable under the Fraudulent Transfer Act because she did not receive any fraudulently transferred assets. The circuit court did, however, find that Tsai aided and abetted the fraudulent transfer by assisting in the formation of Cube Global, Outbox, LLC (one of the companies Tsai used to transfer money for the purchase of the Inverness house), and Matrix, and by using her children's bank accounts to funnel her own money to Cube Global. Finally, the circuit court concluded that Tsai conspired with Cube Global, March, Fang, and Huang in an attempt to transfer March's assets to avoid March's liabilities. The circuit court therefore entered judgment (1) in favor of plaintiffs and against Cube Global on count II (alter ego), (2) in favor of plaintiffs and against Cube Global on count III in the amount of $435,584 (fraudulent transfer), (3) in favor of Tsai and against plaintiffs on count III (fraudulent transfer), and (4) in favor of plaintiffs and against Tsai on counts IV (aiding and abetting) and V (conspiracy) in the amount of $435,584.

¶ 20    Plaintiffs filed a petition for attorney fees and costs seeking $293,607. Defendants challenged numerous fees as improper. Defendants requested an evidentiary hearing and prehearing discovery. On March 2, 2016, the circuit court denied defendants' motion for an evidentiary hearing and awarded plaintiffs $251,755.53 in attorney fees (after disallowing certain fees), $24,303.14 in costs, and $121,965.46 in interest. The circuit court entered a final judgment: (1) against Cube Global on count II in the amount of $676,222.43 ($278,198.30 (the unsatisfied underlying judgment) + 398,024.13 (attorney fees, costs, and postjudgment interest)), and on count III in the amount of $435,584; and (2) against Tsai on counts IV and V in the amount of $435,584.

¶ 21    On June 14, 2016, the circuit court entered a written order denying defendants' postjudgment motion. Relevant to the issues on appeal, the circuit court rejected defendants'

argument that it erred by admitting the Inverness escrow and closing documents into evidence without an adequate foundation. It further rejected defendants' argument that Pakter was improperly allowed to testify to a previously undisclosed opinion, and determined that any error would have been harmless. Finally, the circuit court rejected defendants' arguments regarding whether Cube Global was March's alter ego. The circuit court stated that "veil piercing and alter ego liability are two separate causes of action, and that it is the alter ego cause of action which is alleged in [c]ount II." The circuit court relied on *Federal Insurance Co. v. Maritime Shipping Agencies, Inc.*, 64 Ill. App. 3d 19 (1978) to conclude that, "[f]or years, Illinois courts have recognized a 'stand-alone' alter ego cause of action." The circuit court rejected defendants' argument that *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019 (2007) "supplanted" a stand-alone alter ego cause of action. The circuit court determined, however, that even if count II was a corporate veil piercing claim, the result would be the same, since a veil piercing claim has two prongs: "(1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances." *Tower Investors*, 371 Ill. App. 3d at 1033-34. The circuit court found that "[a]dhering to the fiction of separate corporate existences for March and Cube [Global] would certainly work [an] injustice and sanction fraud." Defendants filed a timely notice of appeal.

¶ 22                                              ANALYSIS

¶ 23    Defendants' first argument on appeal is that the circuit court erred by entering judgment in favor of plaintiffs and against Cube Global on a "stand-alone" cause of action for alter ego liability. Defendants seize on the portion of the circuit court's June 14, 2016, order denying

11

defendants' postjudgment motion in which the circuit court, relying on *Federal Insurance*, concluded that, "[f]or years, Illinois courts have recognized a 'stand-alone' alter ego cause of action." Defendants contend that no such cause of action exists, that "[a]lter ego claims are the same as veil piercing," and that the circuit court "invent[ed] a new claim, with less stringent standards requiring just one prong of the veil piercing test[.]"

¶ 24    The basic tenants of corporation law are familiar. "A corporation is a legal entity separate and distinct from its shareholders, directors, and officers." *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d 166, 172 (1994). A corporation's shareholders, officers, and directors are not generally liable for the corporation's debts. *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 526 (2002). "However, a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Id.* at 527. The alter ego doctrine "fastens liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Id.* Piercing the corporate veil is not a separate cause of action, but instead is a means for imposing liability in an underlying cause of action. *Id.*; *Buckley v. Abuzir*, 2014 IL App (1st) 130469, ¶ 9. "The party seeking to pierce a corporate veil must make a substantial showing that one corporation is a dummy or sham for another." *Buckley*, 2014 IL App (1st) 130469, ¶ 12. The plaintiff must demonstrate that: "(1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances." *Tower Investors*, 371 Ill. App. 3d at 1033-34.

¶ 25    Here, defendants' argument that the circuit court only required plaintiffs to prove the alter ego prong of a veil piercing claim ultimately fails because the circuit court's written orders make

it clear that the circuit court found both that Cube Global was the alter ego of March and that "[a]dhering to the fiction of separate corporate existences for March and Cube [Global] would certainly work [an] injustice and sanction fraud." Defendants fail to address the circuit court's express findings. Defendants have therefore forfeited any argument that the circuit court's findings are against the manifest weight of the evidence. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) ("Points not argued are waived[.]").

¶ 26    We do note, however, that defendants are correct that there is no "stand-alone" alter ego cause of action. As noted above, in order to pierce the corporate veil, a plaintiff must establish both that an individual or entity is the alter ego of a corporation, and that adhering to the fiction of separate corporate entities would promote injustice or inequitable circumstances. See *Tower Investors*, 371 Ill. App. 3d at 1033-34. Here, the circuit court relied on *Federal Insurance* to conclude that, "[f]or years, Illinois courts have recognized a 'stand-alone' alter ego cause of action." In support of this conclusion, the circuit court quoted *Federal Insurance*:

> "The concept of disregarding the corporate existence and imposing liability personally upon the real parties to a transaction is well established and is summarized in 19 C.J.S. Corporations [§] 839, page 264: "Where the director or officer is the alter ego of the corporation, that is, where there is such unity of interest and ownership that the separateness of the individual and corporation has ceased to exist, and the facts are such that an adherence to the fiction of separate existence of the corporation would sanction a fraud or promote injustice, such director or officer will be held liable for obligations of the corporation." The concept has been variously announced, defined, explained, and applied in decisions of many federal and state courts. It has likewise been accepted and

applied by the courts of this state for many years. (See *People ex rel. Scott v. Pintozzi*[, 50 Ill. 2d 115, 128 (1971)] and cases cited therein.) *A corporation may be the Alter ego of another corporation and where this occurs the distinct corporate entity will be disregarded and the two corporations will be treated as one*. See *Dregne v. Five Cent Cab Co.*[, 381 Ill. 594, 603 (1943)]; *Wikelund Wholesale Co. v. Tile World Factory Tile Warehouse*[, 57 Ill. App. 3d 269, 272 (1978)].” (Emphasis added.) *Federal Insurance*, 64 Ill. App. 3d at 30.

In *Federal Insurance*, the plaintiff obtained a judgment against Maritime Shipping Agencies, Inc. and sought to satisfy that judgment against Glacier Marine Agencies, Ltd., Morrie Boas, and Sheldon Shalett, the principal officers of both Maritime and Glacier. *Id.* at 21. We found that the plaintiff was entitled to summary judgment because:

“[T]here are no genuine questions as to the existence of such a unity of interest and ownership among Maritime, Glacier, Boas, and Shalett that their individual identities have ceased to exist, and that an adherence to the fiction of the separate corporate existence of Maritime would sanction a fraud against the creditors of Maritime and would promote injustice.” *Id.* at 31-32.

Although we did not explicitly refer to our analysis as piercing the corporate veil, it is clear from our holding, as well as the authorities we relied on, that we were applying traditional veil-piercing principles to find that Maritime’s alter egos were liable for Maritime’s debts. Neither *Federal Insurance* nor the authorities relied on therein suggest the existence of a stand-alone cause of action for alter ego liability that is separate or different from the equitable remedy of piercing the corporate veil. Instead, a finding that an individual or entity is the alter ego of a corporation is one prong of the veil-piercing analysis. And as we explained above, the circuit

14

court here made findings under both prongs of the veil-piercing analysis. We therefore reject defendants' argument that the circuit court entered judgment on a nonexistent cause of action.

¶ 27 Defendants next argue that the circuit court misapplied the law of veil piercing as it applies to contractual relationships, insisting that the focus should be on the formation of the lease between plaintiffs and March that gave rise to the underlying judgment. Defendants contend that before the circuit court could pierce the corporate veil, plaintiffs needed to present evidence of misrepresentation, concealment, or misunderstanding by March at the time of contracting. Defendants assert that the circuit court "was wrong about the type of case" involved here, and that determining "[w]hether the contract standard applies requires looking to the initial debt for which the veil piercing is sought." We disagree.

¶ 28 In breach of contract cases, "courts apply an even more stringent standard to determine when to pierce the corporate veil than in tort cases." *Saletech v. East Balt, Inc.*, 2014 IL App (1st) 132639, ¶ 26 (citing *Tower Investors*, 371 Ill. App. 3d at 1033). This is because "a party seeking relief for a breach of contract presumably entered into the contract with the corporate entity voluntarily and knowingly and expecting to suffer the consequences of the limited liability status of the corporate form." *Id.* ¶ 26; 1 William Meade Fletcher, Cyclopedia of Corporations § 41.85, at 692 (1999). "Where there is no evidence of any misrepresentation, no attempt to conceal any facts, and the parties possess a total understanding of all of the transactions involved, Illinois courts will not pierce the corporate veil in a breach of contract situation." *Tower Investors*, 371 Ill. App. 3d at 1034 (citing *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 205 (1981)).

¶ 29 We find that the circuit court properly declined to evaluate plaintiffs' veil piercing claim under the principles applicable to breach of contract claims because the present dispute does not

15

involve a breach of contract. Instead, this case involves the enforcement of a judgment: plaintiffs are attempting to hold Tsai and Cube Global liable for the underlying judgment obtained in the underlying action. Under the merger doctrine, once the underlying judgment became final, the lease entirely merged into the judgment, and no further action at law or equity could be maintained on the lease. *Poilevey v. Spivak*, 368 Ill. App. 3d 412, 414 (2006). The formation of the contract, therefore, is irrelevant. Furthermore, defendants' argument would require plaintiffs to establish that, at the time plaintiffs contracted with March in 2002 and again in 2007, plaintiffs were actually contracting with Cube Global (which did not exist until 2008), and that March concealed or misrepresented that fact. This was not a contract action, and thus the circuit court was not required to find fraud, concealment, or misunderstanding at the time that March entered into the Elk Grove Village warehouse lease.

¶ 30    In sum, we find no basis to reverse the circuit court's judgment that Cube Global was liable for the underlying judgment entered against March. The circuit court did not enter judgment on a "stand-alone" alter ego cause of action, and the circuit court was not required to evaluate plaintiffs' veil piercing claims under breach of contract principles. We therefore affirm the circuit court's judgment in favor of plaintiffs on count II.

¶ 31    Next, defendants argue that the circuit court erred by admitting the escrow and closing documents related to Tsai's purchase of the Inverness house into evidence without a proper foundation. We disagree.

¶ 32    A party must lay the proper foundation before introducing a document into evidence. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 348 (2010). Proper authentication of a document requires the proponent to demonstrate that the document is what proponent claims it to be. *Id.* at 348-49; see also Ill. R. Evid. 901 (eff. Jan. 1, 2011).

16

Authentication can be made by either direct or circumstantial evidence. *Id.* at 349. "Routinely, the proponent establishes the identity of the document 'through the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that a particular item is, in fact, what its proponent claims it to be.' " *Id.* (quoting *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 415 (2005)). We review a circuit court's decision to admit or exclude evidence for an abuse of discretion. *Beehn v. Eppard*, 321 Ill. App. 3d 677, 680 (2001). A circuit court abuses its discretion only if it "act[s] arbitrarily without the employment of conscientious judgment, exceed[s] the bounds of reason and ignore[s] recognized principles of law [citation] or if no reasonable person would take the position adopted by the court." *Schmitz v. Binette*, 368 Ill. App. 3d 447, 452 (2006) (citing *Popko v. Continental Casualty Co.*, 355 Ill. App. 3d 257, 266 (2005)).

¶ 33    Plaintiffs sought to establish Tsai's ownership and control over Cube Global in part by showing that Tsai transferred $961,000 from Cube Global accounts into Matrix's account, and then transferred $990,000 from Matrix's accounts to an escrow account at Chicago Title and Trust Company in order to purchase the Inverness house. Defendants argue that the circuit court admitted the following documents relating to the purchase of the Inverness house into evidence without a proper foundation: (1) a "Cash Escrow Trust Agreement," (2) an "Escrow Trust Disbursement Statement," dated July 25, 2011, (3) an "Escrow Receipt and Disbursement Authorization," and (4) a warranty deed dated July 25, 2011, for the property. Defendants conclude that the circuit court's admission of these documents into evidence without a proper foundation warrants a "new trial *** on all counts."

¶ 34    We find that the circuit court did not abuse its discretion in admitting the escrow and closing documents into evidence because a reasonable trier of fact could conclude from Tsai's testimony that the escrow and closing documents were authentic and were what plaintiffs

claimed they were. But even if the circuit court abused its discretion in admitting the documents, the error was harmless.

¶ 35    At trial, Tsai testified that she executed an Illinois Statutory Short Form Power of Attorney for Property authorizing Zhidong Wang to act as her attorney-in-fact, granting him authority to execute documents on her behalf in connection with the purchase of the Inverness house. Tsai acknowledged that the "Cash Escrow Trust Agreement" identified her as the purchaser of the house, and she acknowledged that the document was signed by Wang. When plaintiffs moved to introduce the trust agreement into evidence, defendants' counsel objected "on authenticity and relevance grounds." Plaintiffs' counsel responded: "I think she's identified it as a document that was created in connection with the purchase of her house that was signed by her authorized agent." The circuit court overruled defendants' objection and admitted the trust document into evidence. Tsai acknowledged that the trust number on the trust agreement was the trust number into which $990,000 was wired from Matrix's Chase account on July 22, 2011.

¶ 36    Next, Tsai testified that the "Escrow Trust Disbursement Statement" reflected the same trust number as the trust agreement. The disbursement statement stated, under "Receipts," "7-22-11, Su Chin Tsai, cash to close $990,000." Tsai identified the $990,000 as the money she put in escrow to purchase the Inverness house. When plaintiffs' counsel asked whether the signature on the disbursement statement was Wang's, over defense counsel's foundation objection, Tsai acknowledged that the disbursement statement was signed by Wang under the power of attorney. The disbursement statement was then admitted into evidence over defendants' authenticity and relevance objections.

¶ 37    Tsai then identified the "Escrow Receipt and Disbursement Authorization," which again reflected the same trust number as the trust agreement and the disbursement statement. Over

defense counsel's foundation objection, Tsai acknowledged that the disbursement authorization was signed by Wang under the power of attorney. The disbursement authorization was then admitted into evidence over defendants' objection to a lack of foundation. Finally, Tsai identified the "Warranty Deed General" for the Inverness house, dated July 25, 2011, conveying the property to Tsai. The warranty deed was admitted into evidence over defendants' objection to a lack of foundation.

¶ 38    The circuit court did not abuse its discretion in admitting the escrow and closing documents into evidence because there was sufficient evidence from which it could conclude that the closing and escrow documents were authentic. Tsai acknowledged her attorney's signature on the closing and escrow documents, which she had specifically authorized him to sign on her behalf. Tsai's testimony that her attorney's signature appeared on the closing and escrow documents was sufficient to show her familiarity with her attorney's signature. See Ill. R. Evid. 901(b)(1) (authentication or identification of a document may be satisfied by testimony from a witness with knowledge "that a matter is what it is claimed to be.") Tsai's testimony that she authorized Wang to execute documents on her behalf in connection with the closing coupled with her testimony that the documents at issue were signed by Wang provided a sufficient foundation to admit the closing and escrow documents into evidence.

¶ 39    But even assuming *arguendo* that the circuit court abused its discretion in admitting the documents without a proper foundation, the circuit court's error was harmless. A circuit court's error in admitting evidence without a proper foundation will not be overturned if the error was harmless. *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 43 (citing *Lorenz v. Pledge*, 2014 IL App (3d) 130137, ¶ 18). Here, defendants make no argument that any prejudice resulted from the admission of the escrow and closing documents, or that the admission of the documents in any

way affected the outcome of the trial. Tsai's own testimony demonstrated that she (1) transferred $961,000 from Cube Global's account into Matrix's account, (2) transferred $990,000 from Matrix's account to the escrow trust account, (3) transferred the funds into the escrow trust account for the purposes of purchasing the house, and (4) purchased the Inverness house. From these admitted facts, the circuit court could reasonably infer that Tsai controlled Cube Global to such an extent that she funneled money from Cube Global to purchase the Inverness house even without the escrow and closing documents, which were cumulative and corroborative of her testimony. We find that even if the circuit court abused its discretion in admitting the escrow and closing documents without a proper foundation, the error was harmless and does not provide a basis for disturbing any portion of the circuit court's judgment in favor of plaintiffs.

¶ 40    Next, defendants argue that the circuit court erred by permitting Pakter to testify to an undisclosed opinion at trial. Defendants contend that Pakter's disclosed written report did not contain any opinion that March did not receive reasonably equivalent value from Cube Global in exchange for $92,500 in rent that March paid to Matrix after November 8, 2010, when Cube Global began operating in the Matrix building. Defendants argue that a new trial is warranted, or that the circuit court's judgment on counts III, IV, and V should be reduced by $92,500. We find that the circuit court did not abuse its discretion in admitting Pakter's testimony regarding the rent.

¶ 41    The purpose of "timely disclosure of expert witnesses, their opinions, and the bases for those opinions is to avoid surprise and to discourage strategic gamesmanship among the parties." *Morrisroe v. Pantano*, 2016 IL App (1st) 143605, ¶ 37. Supreme Court Rule 213(f)(3) provides:

> "A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each

controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).

Rule 213(g) limits an expert's testimony at trial to the "information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition[.]" Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). "A witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion, rather than new reasons for it." *Foley v. Fletcher*, 361 Ill. App. 3d 39, 47 (2005); see also *Morrisroe*, 2016 IL App (1st) 143605, ¶ 37 ("An expert witness may expand upon a disclosed opinion provided that the testimony states a logical corollary to the disclosed opinion and not a new basis for the opinion."). The testimony at trial must be encompassed by the original opinion. *Foley*, 361 Ill. App. 3d at 47.

¶ 42    At trial, Pakter testified that March did not receive reasonably equivalent value in exchange for the assets transferred to Cube Global. He placed a value on two specific assets: accounts receivable and rent payments. After detailed testimony was given regarding his opinion of the value of accounts receivable transferred to Cube Global, Pakter testified that no reasonably equivalent value was given in exchange for March's accounts receivable or "for $99,500 of rent that was paid." Defendants objected, arguing Pakter had not previously disclosed his opinion that March did not receive reasonably equivalent value from Cube Global in exchange for the $99,500 in rent paid by March to Matrix. The circuit court overruled the objection, directing defense counsel to the pages of the report that discussed these rent payments. The circuit court concluded by finding that Pakter's report discussed "rents that were paid during the certain

21

period of time during which Cube Global was occupying space at the [Matrix building] ***
which was paid by March."

¶ 43    Pakter, who was deposed twice by defendants, authored a written report, disclosed to
defendants, that thoroughly analyzed all of the asset transfers from March to Cube Global, and
concluded that the entirety of March's business infrastructure was transferred to Cube Global.
Pakter did not opine as to the value of each asset transferred, instead he valued only two asset
classes: accounts receivable and specified rental payments. Pakter's report observed that,
"[b]efore November 5, 2010, Matrix's tenant at [the Matrix building] was March. After
November 8, 2010, March's [*sic*] tenant at the [Matrix building] was Cube. The payments by
March and/or Cube to Matrix have the following strange and/or unusual patterns[,]" shown in the
following table:

| Date | March's Checking Account | Cube's Checking Account |
|------|--------------------------|-------------------------|
| October 21, 2010 | $20,500 | $0.00 |
| November 30, 2010 | $0.00 | $0.00 |
| December 20, 2010 | $20,500 | $10,000 |
| January 20, 2011 | $20,500 | $0.00 |
| February 22, 2011 | $20,500 | $0.00 |
| March 22, 2011 | $0.00 | $20,500 |
| April 19, 2011 | $0.00 | $20,500 |
| May 16, 2011 | $38,000 | $0.00 |

Pakter's report stated that Cube Global "continued in March's space at [the Matrix building] on
or after November 8, 2010; *** March paid rent to Matrix in October 2010, December 2010,
January 2011, February 2011 and May 2011[.]" Pakter's report concluded, in relevant part, that
"Cube did not pay March for its goodwill, assembled workforce, customer lists, customer
relationships, systems, vendor relationships, furniture and/or incoming-earning capabilities." He
further concluded that "March, Cube, Matrix and [Tsai] were (and/or are) interrelated parties[.]
*** The [s]ales agreement and [a]sset [t]ransfer [t]ransactions concealed and/or obfuscated the

22

transfer of March's [a]ccounts [r]eceivable and other valuable assets to Cube without consideration." In his report, Pakter specifically valued the transfer of March's accounts receivable, but did not offer valuations of other transferred assets such as "pallets, furniture, fittings, computers, equipment, telephone equipment, the phone number, [the] fax number," or goodwill. He concluded that the sales agreement and the asset transfer transactions "shifted the entire revenues, assets and income of the fastener business and the means of earning profits for the business located at [the Matrix] building from March to Cube [Global] ***." Pakter's written report specifically documented the "strange and/or unusual patterns" of payments from March and Cube Global to Matrix, and clearly documented rent payments by March to Matrix after November 8, 2010, the date on which Cube Global began operating out of the Matrix building. The basis for Pakter's opinion that March did not receive any reasonably equivalent value for $99,500 in rent that it paid to Matrix after November 8, 2010, was fully disclosed in his written report. The circuit court therefore, did not abuse its discretion in permitting Pakter to testify regarding the rent payments.

¶ 44    Furthermore, the circuit court could reasonably conclude that March paid $99,500 in rent to Matrix for Cube Global's benefit without Pakter's opinion. Pakter testified at trial that "there were three payments of $20,500, plus another payment of $38,000, totaling $99,500, all of which were paid at a time that March was no longer occupying those premises and had a forgiveness from its landlord, and Cube [Global] was occupying and making use of that space." There is no dispute that there was an adequate foundation for this testimony, as it was clearly documented in Pakter's written report. Furthermore, Pakter's testimony clearly demonstrated that March continued to make rent payments after it went out of business and after it had been sued by plaintiffs in the underlying action. Taken together with Pakter's testimony that March transferred

the entirety of March's business infrastructure to Cube Global, there was sufficient evidence from which the circuit court could reasonably conclude that March's rent payments to Matrix was made for Cube Global's benefit and was a fraudulent asset transfer worth $99,500. Therefore, assuming *arguendo* that Pakter's ultimate opinion regarding the rent was undisclosed, any error in admitting the testimony would be harmless because there was a sufficient factual basis for this component of the circuit court's fraudulent transfer judgment. We find that there is no basis for disturbing the circuit court's judgment in favor of plaintiffs on counts III, IV, and V. The circuit court's judgment in favor of plaintiffs on counts III, IV, and V is affirmed.

¶ 45    Finally, defendants argue that the circuit court abused its discretion by denying defendants' motion for an evidentiary hearing on plaintiffs' petition for attorney fees (which were recoverable under the lease between plaintiffs and March) and for awarding improper fees. We disagree.

¶ 46    We review a circuit court's award of attorney fees and costs for an abuse of discretion. *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 105. "[A] fee petition warrants an evidentiary hearing only when the response of the party to be charged with paying the award raises issues of fact that cannot be resolved without further evidence." *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 113. Whether to conduct an evidentiary hearing is within the discretion of the circuit court. *Hess v. Lloyd*, 2012 IL App (5th) 090059, ¶ 26.

¶ 47    After trial, plaintiffs filed a fee petition seeking $293,607.12 in attorney fees and costs, along with $121,965.46 in postjudgment interest that accrued on the balance of the underlying judgment. The fee petition was supported by the affidavit of plaintiffs' counsel, Richard Hoffman. Attached to the fee petition were billing records from July 2011 through January 2016.

In response, defendants' raised a host of arguments seeking disallowance or reductions of plaintiffs' fees and costs, only two of which are relevant on appeal. First, defendants argued that plaintiffs obtained improper attorney fees as part of the underlying judgment because plaintiffs obtained $11,979.50 in fees for irrelevant research and drafting regarding an easement, and for fees incurred while defending plaintiffs' property manager against March's third-party claim in the underlying action. Defendants requested that the circuit court deduct the nearly $12,000 in "improper fees" and over $5000 in accrued postjudgment interest on the improper fees. Second, defendants argued that the billing entries supporting plaintiffs' fee petition included $167,235.60 in attorney fees that "included all entries for an attorney in one entry, without any indication of time spent per task." Defendants requested that the circuit court disallow all of the block-billed fees. Defendants later filed a separate motion requesting an evidentiary hearing and prehearing discovery on plaintiffs' fee petition because of the "excessive" fees and plaintiffs' use of block billing, and because cross-examination of plaintiffs' counsel was necessary to determine the propriety of certain entries.

¶ 48    Plaintiffs filed a reply in support of the fee petition and a response to defendants' request for an evidentiary hearing. Plaintiffs argued that defendants were barred from collaterally attacking the underlying judgment, including any attorney fees awarded as part of the underlying judgment. Plaintiffs contended that even if certain attorney fees were mistakenly included in the underlying judgment, defendants had no basis for challenging those fees in this action. Next, plaintiffs argued that defendants' claim that all the block-billed entries should be disallowed was "unfounded." Plaintiffs attached a supplemental affidavit from Hoffman that sought to separate out the clerical tasks and attorney conferences from the block-billed amounts by estimating the amount of time the clerical task or conference took based on Hoffman's experience. Plaintiffs'

response to defendants' request for an evidentiary hearing noted that defendants failed to offer any evidence to challenge plaintiffs' fee petition, that a hearing was neither required nor necessary, and that hearing would "be unlikely to provide the [c]ourt with any meaningful information, and is likely to cost much more than the process is worth."

¶ 49    The circuit court found that defendants' response to plaintiffs' fee petition did not raise any factual disputes, and therefore denied defendants' motion for an evidentiary hearing. Defendants did not request an opportunity to file a surreply to address Hoffman's supplemental affidavit. On March 2, 2016, the circuit court held a hearing on plaintiffs' fee petition. The circuit court agreed with plaintiffs that defendants were barred from challenging any portion of the attorney fees that were included in the underlying judgment. The circuit court found that the hourly rates set forth in plaintiffs' fee petition were fair and reasonable. The circuit court disallowed (1) $1066 in clerical tasks, (2) $405 in fees for attorney conferences that were not sufficiently detailed, (3) $11,711.35 in excessive fees for research and drafting various documents, (4) $1365 in fees from block-billed entries for various tasks that were either not proper legal tasks or lacked sufficient detail, and (5) $3001.10 in costs for photocopying. In sum, the circuit court awarded plaintiffs $251,755.53 in attorney fees, $24,303.14 in costs, and $121,965.46 in postjudgment interest on the balance of the underlying judgment.

¶ 50    We find that the circuit court did not abuse its discretion in denying defendants' motion for an evidentiary hearing. Defendants' primary contentions are that the plaintiffs' use of block billing made it difficult to determine what amount of time was spent on what activities, Hoffman's supplemental affidavit contained estimates of the time it would take to perform clerical tasks contained in the block-billed entries, and those estimates—made in anticipation of Hoffman's supplemental affidavit—warrant an evidentiary hearing. But defendants make no

argument as to what benefit an evidentiary hearing would have offered. Defendants' response to the fee petition offered no evidence contradicting any of the assertions in Hoffman's original affidavit, and therefore failed to identify any factual dispute that would warrant an evidentiary hearing. Furthermore, defendants did not submit any evidence in response to Hoffman's supplemental affidavit that might call into question the reasonableness of Hoffman's estimates as to how long certain tasks took to complete. The record reflects that the circuit court thoroughly considered plaintiffs' fee petition, found it to be reasonable and disallowed or reduced numerous entries for fees that were excessive, not recoverable, or insufficiently supported. We find that the circuit court did not abuse its discretion in denying defendants' motion for an evidentiary hearing.

¶ 51 Finally, we reject defendants' attempt to collaterally attack the underlying judgment. "Under the collateral attack doctrine, a final judgment rendered by a court of competent jurisdiction may only be challenged through direct appeal or procedure allowed by statute and remains binding on the parties until it is reversed through such a proceeding." *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 189 (2010). Here, March never sought to set aside or appeal the underlying judgment. That judgment, therefore, became final 30 days after it was entered. Nor did March ever seek to set aside any portion of the default judgment pursuant to section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2016)). Therefore, defendants are barred under the collateral attack doctrine from seeking to modify any portion of the underlying judgment.

¶ 52 In defendants' reply brief in this court, defendants assert that the judgment in the underlying action is void because it was "a product of a false statement." Defendants cite *Hustana v. Hustana* for the proposition that,

27

"[W]here a judgment has been obtained through fraud, the judgment may be vacated, even after the expiration of the statutory period within which judgments may be set aside, but the fraud must be a fraud committed by one of the parties on the court, and not merely the perjury of a witness." 22 Ill. App. 2d 59, 64 (1959).

Defendants made a similar argument in response to plaintiffs' fee petition in the circuit court. However, defendants have forfeited this argument by raising it in this court for the first time in a reply brief. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Defendants' claim is also forfeited because defendants fail to meaningfully develop an argument that plaintiffs' inclusion of fees in the underlying judgment amounts to fraud. *Id.* (stating that argument section of an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."). For these reasons, we reject defendants' attempt to collaterally attack the underlying judgment.

¶ 53                                    CONCLUSION

¶ 54    For the foregoing reasons, we reject defendants' argument that the circuit court entered judgment on count II in favor of plaintiffs on a nonexistent cause of action, and further reject defendants' argument that the circuit court should have applied veil piercing principles applicable to breach of contract claims. We therefore affirm the circuit court's judgment on count II in favor of plaintiffs. We find that the circuit court did not abuse its discretion in admitting certain documents into evidence without a proper foundation, and that even if it did, any error was harmless. We further find that the circuit court did not abuse its discretion in permitting plaintiffs' expert to testify about the rent payments made by March after November 8, 2010. The circuit court did not abuse its discretion in denying defendants' motion for an

evidentiary hearing on plaintiffs' fee petition. Finally, defendants are barred by the collateral attack doctrine from challenging any portion of the underlying judgment entered.

¶ 55    Affirmed.