2022 IL App (2d) 210436-U
No. 2-21-0436
Order filed May 31, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| GRAND RIDGE NATIONAL BANK, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-L-267 |
| | ) | |
| KATHARINE MAE CULLUM, as Trustee | ) | |
| under Trust Agreement dated July 16, 2009 and | ) | |
| known as the Katharine M. Henry Qualified | ) | |
| Personal Residence Trust Number 2, | ) | Honorable |
| | ) | James R. Murphy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The money judgment in favor of the plaintiff bank is affirmed. Pursuant to the unambiguous language of the subject guaranty agreement, the defendant trust guaranteed repayment of both a business loan and a home equity line of credit. The consideration supporting the guaranty applying to the preexisting home equity line of credit was the extension of the maturity dates of both loans to April 1, 2017. The trust's defense of lack of notice failed based on the plain language of the guaranty agreement and because the trustee failed to read the guaranty before signing it.

¶ 2   Plaintiff, Grand Ridge National Bank (Grand Ridge), was the successor in interest to the

lender of a home equity line of credit (HELOC) taken out by Katharine M. Henry. Grand Ridge

also was the successor in interest to the lender of a business loan taken out by Charles Hanson. Defendant, Katharine Mae Cullum,[1] was Henry's daughter and Hanson's granddaughter. In October 2016, Cullum—acting as trustee under Trust Agreement dated July 16, 2009, and known as the Katharine M. Henry Qualified Personal Residence Trust Number 2 (QPRT 2)—signed an "unlimited continuing guaranty." The parties agree that QPRT 2 guaranteed the business loan, but they disagree as to whether the guaranty also applied to the HELOC.

¶ 3       The business loan was paid off later. Henry, however, defaulted on the HELOC, and Grand Ridge commenced this action to enforce QPRT 2's guaranty of that loan. After a bench trial, the court determined that QPRT 2's guaranty applied to the HELOC. The court entered judgment in Grand Ridge's favor in the amount of $403,686.02. QPRT 2 appeals. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5                    A. The Origination of the Business Loan and the HELOC

¶ 6       In 2005, Hanson took out a $273,000 business loan with Grand Ridge's predecessor in interest. This loan was secured by a mortgage on Hanson's residence in West Chicago, along with an assignment of leases and rents from that property. Apparently, this was a balloon loan that was scheduled to mature in early 2016.

¶ 7       Henry had a finance background and experience as a commercial real estate paralegal for a law firm. By the time of trial, she was working as a loan officer. She owned a residence in St. Charles, and she had other properties in Florida.

_____

[1] Cullum's previous last names appear throughout the record. We will use the name that she provided at trial.

¶ 8     In 2005, Henry took out a $292,500 HELOC with Grand Ridge's predecessor in interest. This was a balloon loan with a maturity date of April 15, 2015. The HELOC was secured by a junior mortgage on Henry's St. Charles residence.

¶ 9     In 2009, Henry transferred her St. Charles residence to a qualified personal residence trust that we will call "QPRT 1." Henry also owned an investment condominium in Florida, which Henry transferred to QPRT 2 in 2009. Cullum was the trustee of both QPRT 1 and QPRT 2.

¶ 10                    B. The Loans Come Due

¶ 11     In 2015, Grand Ridge merged with another bank, thereby acquiring Hanson's business loan and Henry's HELOC. Over the years, Henry had paid interest on the HELOC but no principal. Hanson had paid down some principal on the business loan. In 2015, Grand Ridge twice extended the maturity date of the HELOC: once to August 1, 2015, and again to February 1, 2016. Accordingly, both the business loan and the HELOC were set to mature in early 2016. By that time, Hanson was elderly, and Henry was acting as his power of attorney.

¶ 12     Throughout 2016 and 2017, Henry, with the assistance of legal counsel, communicated extensively with representatives of Grand Ridge about both loans. It is evident from reviewing these communications that Henry's financial situation was precarious. Grand Ridge and Henry hoped that extending the maturity dates of the two loans would avoid defaults by giving Henry time, either to sell properties or to refinance with different lenders. As will be explained, however, as Grand Ridge granted these extensions, it took steps to protect itself by obtaining additional security and guaranties.

¶ 13                    C. The First Three Sets of Loan Extensions in 2016

¶ 14     By a document dated January 30, 2016, Grand Ridge extended the maturity date of the HELOC to May 1, 2016. There were no dates listed next to the signatures on this document. By

documents dated February 1, 2016—but which were signed in late March—Grand Ridge likewise extended the maturity date of the business loan to May 1, 2016. Among the documents executed in connection with this extension of the business loan were (1) a business loan agreement, (2) an unlimited continuing guaranty, (3) a commercial real estate mortgage, and (4) an assignment of leases and rents. In summary, QPRT 2 (1) guaranteed the business loan and (2) granted a junior mortgage and an assignment of leases and rents with respect to Henry's Florida condominium.

¶ 15    By a document dated April 30, 2016, Grand Ridge again extended the maturity date of the HELOC to July 1, 2016. There were no dates listed next to the signatures on this document. In a renewal agreement dated May 1, 2016—but which was signed in late June—Grand Ridge likewise extended the maturity date of the business loan to July 1, 2016.

¶ 16    By a document dated June 30, 2016, Grand Ridge again extended the maturity date of the HELOC to October 1, 2016. There were no dates listed next to the signatures on this document. By documents dated July 1, 2016—but which were signed in August—Grand Ridge likewise extended the maturity date of the business loan to October 1, 2016. QPRT 2 executed another unlimited continuing guaranty of the business loan in connection with this extension.

¶ 17                    D. The Fourth Set of Loan Extensions in 2016

¶ 18    By a document dated September 30, 2016, Grand Ridge again extended the maturity date of the HELOC to April 1, 2017. There were no dates listed next to the signatures on this document. By documents dated October 1, 2016—but which were all signed by Henry on October 13—Grand Ridge likewise extended the maturity date of the business loan to April 1, 2017. Among the documents attendant to this extension of the business loan were (1) a business loan agreement, (2) a commercial promissory note renewal, and (3) a business purpose statement. Cullum, as trustee of QPRT 2, signed the business loan agreement as a guarantor, but she did not list any date

next to her signature. In a document dated October 1, 2016, Cullum, as trustee of QPRT 2, signed the unlimited continuing guaranty that is at issue in this appeal (the October 2016 guaranty). Cullum did not list a date next to her signature on the October 2016 guaranty.

¶ 19    Emails introduced at trial support a conclusion that all documents associated with the fourth set of loan extensions were executed by Henry and/or Cullum on or about October 13, 2016, and then were returned together to Grand Ridge for signatures by one of its representatives. Specifically, on September 29, 2016, Grand Ridge emailed a package to Henry's counsel containing loan extension documents for both the HELOC and the business loan. Per this original loan package, the maturity date of the business loan would have been extended to April 1, 2017, but the HELOC maturity date would have been extended only to December 30, 2016. On October 5, 2016, Henry's counsel recommended some changes to the loan extension documents. On October 7, 2016, Grand Ridge incorporated those changes and then resubmitted the package of loan extension documents to Henry's counsel. On October 11, 2016, Henry's counsel proposed additional changes to the loan extension documents, including changing the maturity date of the HELOC to avoid having to "execute another extension around the Christmas holidays." On October 13, 2016, Grand Ridge emailed to Henry's counsel a revised HELOC extension document, which extended the maturity date of the HELOC to April 1, 2017, like the business loan. In that email, Grand Ridge requested that all documents relating to both loan extensions be executed and returned by October 17. In an email dated October 20, 2016, Grand Ridge confirmed receipt of the executed loan extension documents, some of which had signatures from Henry dated October 13. Thus, although only certain documents bear dates next to the signature lines, it seems that Henry and Cullum signed all documents relating to both loan extensions on or about October 13.

¶ 20    To understand the parties' arguments about the scope of QPRT 2's October 2016 guaranty, it is necessary to examine some documents in further detail.

¶ 21                    1. *The October 2016 Business Loan Agreement*

¶ 22    Title to the West Chicago property securing the business loan was held by two qualified personal residence trusts: one having been established by Hanson, and the other by Hanson's wife. By October 2016, both Hanson and his wife were deceased. Accordingly, unlike in the documents accompanying previous extensions of the maturity date of the business loan, in the October 2016 business loan agreement, Hanson was no longer listed as the borrower. Instead, the borrowers were listed as (1) Henry, (2) Hanson's qualified personal residence trust, and (3) Hanson's wife's qualified personal residence trust.

¶ 23    The October 2016 business loan agreement contained the following provision regarding cross-collateralization: "It is the intent of all Parties to cross collateralize all of its Indebtedness and obligations to Lender, howsoever arising and whensoever incurred, except any obligation existing or arising against the principal dwelling of any Party."

¶ 24    The "guarantors" listed in the October 2016 business loan agreement were QPRT 2 and Henry. The agreement of the guarantors in this document was as follows:

> "Guarantor (i) acknowledges reading and understanding this Agreement; (ii) consents to the provisions of this Agreement relating to Borrower; (iii) agrees to furnish the Financial Statements to Lender that Lender reasonably requests; (iv) agrees to those portions of this Agreement that apply to Guarantor; (v) acknowledges that this Agreement has been freely executed without duress and after an opportunity to consult with counsel; and (vi) confirms that Guarantor received a copy of this Agreement, the Guaranty, and the other documents Guarantor requested."

¶ 25                    2. *The October 2016 Commercial Promissory Note Renewal*

¶ 26    The October 2016 commercial promissory note renewal listed the borrowers as (1) Henry, (2) Hanson's qualified personal residence trust, and (3) Hanson's wife's qualified personal residence trust. The security or collateral associated with this note was listed as (1) a 2005 assignment of leases and rents to the West Chicago property, (2) a 2005 mortgage on the West Chicago property, (3) a February 2016 assignment of leases and rents to the Florida condominium that was titled to QPRT 2, and (4) a February 2016 mortgage on that same Florida condominium. The commercial promissory note renewal also recited that, "[i]n support of this transaction," guaranties dated October 1, 2016, were executed by both QPRT 2 and Henry. Presumably, that referred to the limited "guaranty" that was contained within the accompanying October 2016 business loan agreement.

¶ 27                    3. *The October 2016 Business Purpose Statement*

¶ 28    In the October 2016 business purpose statement, the purpose of the loan was identified as "Renewal of Commercial Mortgage Loan." In this document, Henry certified that the proceeds of the loan would "be used for the business purpose stated above and for no other purpose." Henry also acknowledged that this certification was meant to induce Grand Ridge to extend the loan to her "as a business entity."

¶ 29                    4. *The October 2016 Guaranty*

¶ 30    Cullum, as trustee of QPRT 2, executed the October 2016 guaranty. The borrowers were listed as (1) Henry, (2) Hanson's qualified personal residence trust, and (3) Hanson's wife's qualified personal residence trust. A section with the heading "notice to guarantor" provided as follows:

"Lender has agreed to extend credit and financial accommodations to Borrower pursuant to a promissory note executed on even date herewith (the 'Note'), and all agreements, instruments and documents executed or delivered in connection with the foregoing or otherwise related thereto (together with any amendments, modifications, or restatements thereof, the 'Related Documents').

Guarantor is affiliated with Borrower, and as such, shall be benefitted directly by the transaction contemplated by the Related Documents, and shall execute this Guaranty in order to induce Lender to enter the transaction.

In consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby guarantees, promises and undertakes, both jointly and severally, as follows."

Next, a section with the heading "unlimited continuing guaranty" provided, in relevant portion:

"Guarantor hereby unconditionally, absolutely, and irrevocably guarantees to Lender the full and prompt payment and performance when due (whether at the maturity date or by required prepayment, acceleration, or otherwise) of all Obligations of the Borrower to the Lender (notwithstanding the fact that from time to time there may be no indebtedness outstanding), however created, of every kind and description, whether now existing or hereafter arising and whether direct or indirect, due or which may become due, absolute or contingent, primary or secondary, liquidated or unliquidated, whether originated with Lender or owed to others and acquired by Lender by purchase, assignment, or otherwise, and including without limitation all loans, advances, indebtedness and each and every other obligation arising under the Related Documents, and all agreements, instruments and documents evidencing, guarantying, securing or otherwise executed in

connection with any of the foregoing, together with any amendments, modifications, and restatements thereof, plus Expenses (as that term is defined below).

"This Guaranty is an absolute, present, unconditional, and continuing guaranty of payment and performance that shall remain in full force and effect until all such Obligations shall be fully paid to Lender and otherwise performed."

"Obligations" was defined, in relevant portion, as "any and all indebtedness, obligations, undertakings, covenants, agreements, and liabilities of the Borrower to the Lender, and all claims of the Lender against the Borrower, now existing or hereafter arising." "Expenses" included Grand Ridge's attorney fees and costs to enforce the guaranty.

¶ 31　The security or collateral identified in this guaranty included (1) a 2005 assignment of leases and rents to the West Chicago property, (2) a 2005 mortgage on the West Chicago property, (3) a February 2016 assignment of leases and rents to the Florida condominium that was titled to QPRT 2, and (4) a February 2016 mortgage on that same Florida condominium.

¶ 32　In a portion of the guaranty under the heading "general waivers," QPRT 2 waived, among other things, "notice of acceptance of this Guaranty and all notice of the creation, extension or accrual of any of the Obligations." QPRT 2 also waived "any defense that could be asserted by Borrower," including "failure of consideration." QPRT 2 further "waiv[ed] and agree[d] not to assert any and all rights, benefits, and defenses that might otherwise be available under the provisions of the governing law that might operate, contrary to Guarantor's agreements in this Guaranty, to limit Guarantor's liability under, or the enforcement of, this Guaranty, including all defenses of suretyship."

¶ 33    A portion of the guaranty under the heading "acknowledgement" stated that Grand Ridge specifically bargained for QPRT 2's waiver of defenses as part of the "consideration for entering into this transaction."

¶ 34                                    E. Events in 2017

¶ 35    By a document dated March 31, 2017, Grand Ridge again extended the maturity date of Henry's HELOC to October 1, 2017. There were no dates listed next to the signatures on this document. In early May 2017, Henry, as trustee for her parents' trusts, sold the West Chicago property and used the proceeds to pay off the business loan.

¶ 36    Unfortunately, Henry was unsuccessful in her efforts to sell or refinance her own properties to allow her to repay the HELOC. When the HELOC came due again in October 2017, Grand Ridge and Henry were unable to agree on terms for a further extension. At that point, the value of Henry's St. Charles residence was less than the outstanding mortgages and unpaid taxes. Grand Ridge proposed avoiding a short sale by issuing a new loan to Henry, secured by one of her properties in Florida, with the proceeds then being used to reduce the principal on the HELOC. That plan never came to fruition.

¶ 37                                       F. Litigation

¶ 38    In May 2018, Grand Ridge filed a complaint in the circuit court of Kane County against Cullum, as trustee of QPRT 2. Grand Ridge alleged that, pursuant to the October 2016 guaranty, QPRT 2 was liable for the amount owing on the HELOC.

¶ 39    QPRT 2 pleaded four affirmative defenses, one of which was lack of consideration. The trial court granted Grand Ridge's motion to strike all affirmative defenses, but the order does not indicate whether the defenses were stricken with or without prejudice. The record on appeal does not contain a transcript of the hearing on that motion.

¶ 40     The matter proceeded to a bench trial in April 2021. QPRT 2 was represented by the same counsel who had represented Henry during her negotiations with Grand Ridge in 2016 and 2017. Part of QPRT 2's theory of the case was that, by its plain terms, the October 2016 guaranty did not apply to the HELOC. Even if it did, QPRT 2 submitted that there was no consideration for such guaranty and that QPRT 2 lacked notice of its obligations.

¶ 41     The parties stipulated to the admission of extensive documentary evidence, including trust documents, loan agreements, and emails. Much of the trial consisted of the parties' attorneys walking witnesses through exhibits to highlight salient points that the parties wished to bring to the judge's attention. Over Grand Ridge's objection, the court allowed parol evidence. Having already explained the relevant agreements, it is unnecessary to recount the trial testimony in detail. It will suffice to say the following.

¶ 42     Mark Scheffers, who was Grand Ridge's chairman and CEO, was the primary point of contact for both the business loan and the HELOC. Scheffers testified that the parties always discussed the two loans together. Scheffers explained that he always sent Henry's counsel a package containing documents relating to the extensions for both loans. Henry's counsel would review the documents, and the signed documents for both loans would later be returned together to Grand Ridge.

¶ 43     Scheffers further testified that his intention was for QPRT 2's October 2016 guaranty to encompass the HELOC. Scheffers said that he wanted this guaranty because Henry failed to make progress toward selling and/or refinancing her properties. Scheffers would not have extended the HELOC past October 1, 2016, without this additional guaranty. Scheffers acknowledged that it was never explicitly stated in any of the parties' emails that QPRT 2 would guaranty the HELOC. However, Scheffers believed that this was consistent with the parties' plan to use proceeds from a

refinance of Henry's Florida condominium to repay part of the HELOC and then grant Grand Ridge a security interest in the condominium.

¶ 44    Henry, by contrast, testified to her understanding that QPRT 2's October 2016 guaranty applied only to the business loan. Henry testified that she never discussed with any representative of Grand Ridge having QPRT 2 guarantee the HELOC. Henry believed that the extensions of the maturity date of her HELOC were separate from the extensions of the business loan. She testified that she never directed Cullum, as trustee of QPRT 2, to guarantee the HELOC. According to Henry, the first time she heard Grand Ridge claim that QPRT 2 had guaranteed the HELOC was in late 2017.

¶ 45    Cullum essentially testified that she signed documents, without thoroughly reading them, whenever Henry directed her to sign something. The evidence showed that, in 2016 and 2017, Henry's counsel reviewed all documents relating to both the business loan and the HELOC before either Henry or Cullum signed them.

¶ 46                        G. The Court's Findings and Judgment

¶ 47    The court ruled in Grand Ridge's favor, reasoning as follows. The October 2016 guaranty was unambiguous. Looking to the four corners of that document, Grand Ridge "proved a prima face case" that the guaranty applied to the HELOC, because (1) Henry was listed as a borrower, and (2) the guaranty broadly covered all of the borrowers' debt with Grand Ridge. To the extent that counsel for QPRT 2 emphasized that the cross-collateralization provision in the October 2016 business loan agreement stated that it would not extend to "the principal dwelling of any Party," that provision related to "the business loan itself" and to the separate, more limited "short-form guaranty" that Henry and QPRT 2 signed in the business loan agreement.

¶ 48    The court further determined that, per the language of the guaranty, QPRT 2 waived all defenses. Nevertheless, Grand Ridge proved all elements to sustain a breach of contract action, including consideration.

¶ 49    Aside from the broad language of the guaranty, the court found that the parties addressed the two loans "as a package" and discussed the loans together "in the same breath." The court found that the October 2016 extensions of the maturity dates of the business loan and the HELOC were done at the same time, or that the HELOC was extended "just before" the business loan.

¶ 50    Commenting on the testimony at trial, the court said that "[t]he testimony of Kathy Henry and her daughter [Cullum] did not help" the defense's position. For one thing, Cullum signed documents, without knowing what she was signing, at Henry's direction. Moreover, although Henry testified about her own lack of intent for the October 2016 guaranty to apply to the HELOC, Henry was "not the party that is relevant here," as she was not the guarantor. The court determined that Henry's testimony showed, at most, a unilateral mistake on her part. Apparently addressing the defense of lack of notice of the scope of the guaranty, the court observed that Henry, who "had her own experience as a loan officer," reviewed the documents, as did Henry's attorney, who approved the documents "in form and substance."

¶ 51    The court entered a $403,686.02 judgment in Grand Ridge's favor, which included attorney fees and costs. QPRT 2 timely appealed.

¶ 52                                    II. ANALYSIS

¶ 53    QPRT 2 argues that the court erroneously determined that QPRT 2 guaranteed the HELOC. According to QPRT 2, applying the "four corners rule" compels the conclusion that the October 2016 guaranty was limited to the business loan. Alternatively, QPRT 2 suggests that the scope of the guaranty was ambiguous, opening the door for parol evidence and requiring us to construe any

ambiguity in QPRT 2's favor. QPRT 2 further maintains that there was no consideration for the guaranty to cover the preexisting HELOC debt. QPRT 2 also asserts that Grand Ridge failed to provide notice that the guaranty applied to the HELOC, thus violating Grand Ridge's implied duty of good faith.

¶ 54    Grand Ridge responds that the October 2016 guaranty unambiguously applied to the HELOC. Grand Ridge insists that QPRT 2 waived all defenses and that such defenses lack merit.

¶ 55    Generally, where a matter proceeds to a bench trial, we apply the manifest-weight-of-the-evidence standard in reviewing the judgment. *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 33. "A judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or when the trial court's findings appear to be arbitrary, unreasonable, or not based on the evidence." *Wiczer*, 2015 IL App (1st) 123753, ¶ 33. However, to the extent that the trial court interpreted the contract as a matter of law, we review the judgment *de novo*. *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 57.

¶ 56    As part of its ruling, the trial court determined that the October 2016 guaranty unambiguously applied to the HELOC. Our first task in this appeal is to review that determination *de novo*. See *Shields Pork Plus, Inc. v. Swiss Valley Ag Service*, 329 Ill. App. 3d 305, 311 (2002) ("The determination of whether a contract is ambiguous is a question of law for the court."). As we will explain, we agree with the trial court that the plain language of the guaranty applied to the HELOC. We also affirm the court's rulings regarding the two defenses that QPRT 2 raised.

¶ 57                    A. Whether the Contract is Ambiguous

¶ 58    "A guarantor has acquired status as a favorite of the law, and when construing liability the court accords the guarantor the benefit of any doubts that may arise from the language of the contract." *Southern Wine & Spirits of Illinois, Inc. v. Steiner*, 2014 IL App (1st) 123435, ¶ 16. To

that end, "the scope of a guarantor's liability extends no further than that which the guarantor has agreed to accept." *Southern Wine & Spirits*, 2014 IL App (1st) 123435, ¶ 16. Nevertheless, we apply general principles of contract construction when construing a guaranty. *Southern Wine & Spirits*, 2014 IL App (1st) 123435, ¶ 16. Therefore, "[w]here a guaranty is unequivocal, it must be construed according to the terms and language used, as it is presumed the parties meant what the language imports." *Southern Wine & Spirits*, 2014 IL App (1st) 123435, ¶ 16.

¶ 59    To ascertain whether a contract is ambiguous, courts apply the "four corners rule," looking "to the language of the agreement alone." *Wiczer*, 2015 IL App (1st) 123753, ¶ 35. The parties' disagreement regarding the interpretation of the contract does not, in itself, render the contract ambiguous. *Shields Pork Plus*, 329 Ill. App. 3d at 310. Instead, a contract is ambiguous " 'when the language used is susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression [citation].' " *Shields Pork Plus*, 329 Ill. App. 3d at 310 (quoting *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617 (1988)).

¶ 60    We hold that the October 2016 guaranty unambiguously applied to the HELOC. Henry was identified as a "Borrower" in the guaranty, and Grand Ridge was the "Lender." QPRT 2 broadly guaranteed "all Obligations of the Borrower to the Lender." In relevant portion, "Obligations" was defined as "any and all indebtedness, obligations, undertakings, covenants, agreements, and liabilities of the Borrower to the Lender, and all claims of the Lender against the Borrower, now existing or hereafter arising." This guaranty would "remain in full force and effect until all such Obligations shall be fully paid to Lender and otherwise performed." Henry was obligated to Grand Ridge both under a HELOC and a business loan. Accordingly, under the plain language of the October 2016 guaranty, QPRT 2 guaranteed Henry's obligations under the HELOC.

¶ 61    In arguing to the contrary, QPRT 2 maintains that Henry was a borrower under the October 2016 guaranty only in her capacity as a business entity, not an individual consumer. QPRT 2 reaches this conclusion by looking to the business loan documents that Henry signed on October 13, 2016. QPRT 2 emphasizes that the October 2016 guaranty mentioned certain "Related Documents," which QPRT 2 construes as referring solely to the documents effectuating the extension of the maturity date of the business loan.

¶ 62    QPRT 2's argument that Henry was a borrower under the October 2016 guaranty only in her capacity as a business entity is unpersuasive. Even were we to accept QPRT 2's position that the document extending the maturity date of the HELOC to April 1, 2017, was not a "Related Document," the broad language of the guaranty was not limited to obligations arising under the "Related Documents." Instead, the guaranty designated obligations arising under the "Related Documents" as merely one example of Henry's "Obligations" that QPRT 2 agreed to guarantee. Additionally, next to Henry's name on the October 2016 guaranty, it says: "Type of Entity: Individual."

¶ 63    QPRT 2 further notes that the October 2016 business loan agreement contained the following provision: "It is the intent of all Parties to cross collateralize all of its Indebtedness and obligations to Lender, howsoever arising and whensoever incurred, except any obligation existing or arising against the principal dwelling of any Party." To the extent that this provision is relevant to the guaranty, we note that the provision addresses collateral. Per the October 2016 business loan agreement, "Collateral" was defined as "Property that any Party *** may pledge, mortgage, or give Lender a security interest in." Under this definition, a guaranty is not collateral. Instead, a guaranty is "an agreement between a guarantor and a creditor wherein the guarantor agrees to be secondarily liable to the creditor for a debt or obligation owed to the creditor by a third party (the

debtor)." *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 448-49 (2009). Thus, the provision in the October 2016 business loan agreement regarding cross-collateralization is consistent with our conclusion that QPRT 2 guaranteed the HELOC. We further note that the primary asset of QPRT 2 was a Florida condominium that was Henry's investment property, not her principal dwelling.

¶ 64　For these reasons, we hold that the trial court properly determined that, under a "four corners" analysis, the October 2016 guaranty unambiguously applied to the HELOC.

¶ 65　　　　　　　　　　　　　　　　B. Defenses

¶ 66　QPRT 2 raises two defenses against applying the October 2016 guaranty to the HELOC: (1) there was no consideration supporting a guaranty of the HELOC, and (2) Grand Ridge failed to provide notice that the guaranty would apply to the HELOC. Grand Ridge responds that, per the plain language of the October 2016 guaranty, QPRT 2 waived its right to assert any defenses. Grand Ridge further argues that QPRT 2's defenses lack merit.

¶ 67　The parties submit scant authority in support of their respective positions as to whether QPRT 2 waived its defenses. Grand Ridge cites two cases, neither of which involved the same defenses asserted here. See *Ishak v. Elgin National Bank*, 48 Ill. App. 3d 614 (1977); *United Air Lines, Inc. v. ALG, Inc.*, 916 F. Supp. 793 (N.D. Ill. 1996). Assuming, without deciding, that QPRT 2 did not contractually waive its right to assert these defenses, as explained below, the defenses fail on the merits.

¶ 68　　　　　　　　　　　　　　1. *Lack of Consideration*

¶ 69　Generally, the question of whether there was consideration for a contract is a question of law that we review *de novo*. *In re Marriage of Tabassum & Younis*, 377 Ill. App. 3d 761, 770 (2007). Here, however, the court held a bench trial and made factual findings bearing on whether

there was consideration for QPRT 2's guaranty of the HELOC. To the extent that the court's factual findings are "relevant to our determination" of the issue of consideration, we must defer to those findings unless they were against the manifest weight of the evidence. See *International Supply Co.*, 391 Ill. App. 3d at 447-48 (explaining that, when a court holds a bench trial in a breach-of-contract action, legal issues may be intertwined with factual findings).

¶ 70 As an initial matter, QPRT 2 notes that the trial court made a comment about there not being any consideration "*per se.*" The comment was:

> "The Illinois cases support the continuing guaranty and the consideration for that even though there's preexisting debt that is being guaranteed and no new consideration per se, but it is consideration because they were all talking about extending the date or renewing the old debt, the HELOC, in the same breath that they were talking about the new business loan or extending the business loan now that the parents have died."

Reviewing the court's ruling in its entirety, the court plainly determined that there was consideration supporting QPRT 2's guaranty of the HELOC. The comment at issue was part of an explanation, though perhaps inartful, of how case law generally addresses consideration for guaranty agreements.

¶ 71 QPRT 2 acknowledges that there was consideration supporting the October 2016 guaranty to the extent that QPRT 2 guaranteed the business loan. QPRT 2 argues only that there was no "additional consideration" to support a promise to guarantee the HELOC. QPRT 2 invokes case law indicating: "Where a guaranty is executed contemporaneously with the note or obligation guaranteed, the consideration for the note or obligation furnishes consideration for the guaranty, but where the guaranty is executed after the guaranteed debt is incurred, new consideration is necessary to support the guaranty." *American National Bank of Champaign v. Warner*, 127 Ill.

App. 3d 203, 207 (1984). QPRT 2 premises its arguments on the assumptions that (1) the HELOC was Henry's "preexisting" debt, (2) the extensions of the business loan and the HELOC were part of separate transactions, and (3) the October 2016 extension of the maturity date of the HELOC was not executed contemporaneously with the business loan transaction that spawned the October 2016 guaranty. QPRT 2 repeatedly asserts in its brief that the maturity date of the HELOC was extended on September 30, 2016, whereas that operative guaranty and the business loan extension documents were signed on October 13, 2016.

¶ 72    As noted above, a guaranty is "an agreement between a guarantor and a creditor wherein the guarantor agrees to be secondarily liable to the creditor for a debt or obligation owed to the creditor by a third party (the debtor)." *International Supply Co.*, 391 Ill. App. 3d at 448-49. Like any other contract, a guaranty is enforceable only if it is supported by consideration. *Tower Investors, LLC, v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1028 (2007). Importantly, such consideration need not benefit the guarantor. *Tower Investors*, 371 Ill. App. 3d at 1028. Therefore, where a guaranty agreement is executed "contemporaneously" with the third party's assumption of the underlying obligation, the consideration for the underlying obligation also supports the guaranty. *Tower Investors*, 371 Ill. App. 3d at 1028. "However, where the guaranty is executed after the underlying obligation has been entered into, new consideration becomes necessary to support it." *Tower Investors*, 371 Ill. App. 3d at 1028. The rationale for the rule is obvious: absent some separate consideration, the guarantor's guaranty of a third party's preexisting debt would be gratuitous.

¶ 73    Case law accords some flexibility regarding whether a guaranty is executed "contemporaneously" with a third party's assumption of the underlying obligation. To that end, courts may consider whether the guaranty was part of the same broader transaction that generated

the underlying obligation. See *L.D.S., LLC v. Southern Cross Food, Ltd.*, 2011 IL App (1st) 102379, ¶¶ 44, 47 (a plaintiff alleged sufficient facts to show that a lease agreement was part of the same transaction as a guaranty agreement that was signed six days later, so it was unnecessary for the plaintiff to establish separate consideration for the guaranty).

¶ 74 Here, both the HELOC and the business loan were preexisting debts, as Grand Ridge's predecessor in interest lent the funds for those loans in 2005. But in late 2016, when both loans were set to mature, the parties executed extension agreements, undertaking new obligations in connection with those debts. In presenting its argument, QPRT 2 assumes that the October 2016 extension of the maturity date of the business loan was a separate transaction from the extension of the HELOC. QPRT 2 also assumes that the extension of the HELOC was finalized before Cullum signed the October 2016 guaranty. From those assumptions, QPRT 2 rationalizes that there was consideration for the guaranty of the business loan but not for any guaranty of the HELOC. The record, however, contradicts the premises of QPRT 2's argument.

¶ 75 The trial court found that the two loan extensions were executed at the same time or that the HELOC was extended "just before" the business loan. That finding was not against the manifest weight of the evidence. Some of the relevant documents do not indicate on their face when exactly the parties signed them. However, emails introduced at trial show that Grand Ridge sent all loan extension documents to Henry's counsel as a package. After Grand Ridge incorporated some modifications proposed by Henry's counsel, all signed documents for both loan extensions were returned to Grand Ridge at the same time. The most reasonable inference from the evidence was that Henry and Cullum signed all loan extension documents on or about October 13, 2016.

¶ 76 Accordingly, contrary to what Henry claimed at trial—and contrary to what QPRT 2 assumes on appeal—the October 2016 extensions of both loans clearly proceeded simultaneously. The emails corroborate the testimony of Grand Ridge's chairman and CEO, Scheffers, who testified that the parties always executed documents relating to both loan extensions at the same time. Scheffers further testified that Grand Ridge would not have extended the HELOC past October 1, 2016, without QPRT 2 guaranteeing that loan.

¶ 77 Aside from the simultaneous execution of documents for both loan extensions in October 2016, the record overwhelmingly supports a conclusion that the maturity dates of the loans were extended as part of a single transaction. As the trial court found, the email communications demonstrated that Henry's counsel and representatives of Grand Ridge routinely discussed the two loans together "in the same breath" and as a "package." Viewed in this light, the extensions of the maturity dates of the HELOC and the business loan to April 1, 2017, were the new or additional consideration that was required for QPRT 2's guaranty of both preexisting debts.

¶ 78 The circumstances here are distinguishable from *American National Bank of Champaign*, which QPRT 2 cites. In that case, the parties signed a guaranty agreement in which they "agreed to do nothing more than that which they were already [contractually] obligated to do." *American National Bank of Champaign*, 127 Ill. App. 3d at 208. Here, by contrast, the October 2016 guaranty was executed contemporaneously with extensions of the maturity dates for two loans. Those extensions materially changed the rights and duties of the parties to the preexisting debts.

¶ 79 QPRT 2 argues that the trial court erroneously determined that forbearance was part of the consideration, as there was never any forbearance agreement. Having determined that there was consideration, we need not address this point.

¶ 80                     2. *Notice of Increased Risk to Guarantor*

¶ 81    QPRT 2 also argues that Grand Ridge needed to provide notice of the obligations if it wanted QPRT 2 to guarantee the HELOC. In presenting this argument, QPRT 2 invokes the covenant of good faith and fair dealing that is implicit in all contracts. See *Bank One, Springfield v. Roscetti*, 309 Ill. App. 3d 1048, 1059 (1999) ("Every contract implies good faith and fair dealing between the parties to it."). QPRT 2 characterizes the guaranty of the HELOC as an "increased risk" to the guarantor. Presumably intending to defend Cullum's failure to recognize that QPRT 2 was guaranteeing the HELOC, QPRT 2 notes that the guaranty resembled prior ones that Cullum had signed that guaranteed only the business loan. QPRT 2 emphasizes that, in the email correspondence between Henry's counsel and Grand Ridge leading up to the execution of the October 2016 guaranty, Grand Ridge never requested QPRT 2 to guarantee the HELOC. QPRT 2 also insists that the October 2016 guaranty referenced the business loan but not the HELOC.

¶ 82    The trial evidence did not support this defense of lack of notice. As explained above, QPRT 2 unambiguously guaranteed all of Henry's "Obligations" to Grand Ridge, which would include the HELOC. Moreover, Cullum signed the guaranty without reading it. Accordingly, any claim to lack of notice of the scope of the guaranty rings hollow. See *State Bank of Geneva v. Sorenson*, 167 Ill. App. 3d 674, 681 (1988) ("A party who has had an opportunity to read a contract before signing, but signs before reading, cannot later plead lack of understanding or that the contract misled him."). Contrary to QPRT 2's argument, "[i]n the absence of a fiduciary duty, a bank does not have an obligation to explain the legal effect of a document to the person whose signature is sought on that document." *State Bank of Geneva*, 167 Ill. App. 3d at 681. No such fiduciary duty existed here, and the evidence showed that Henry's counsel reviewed the package of loan documents before Cullum signed the guaranty. Under these circumstances, the evidence did not support the defense of lack of notice.

¶ 83    QPRT 2 also references an October 11, 2017, email from Grand Ridge to Henry's counsel. By the time of this email, Henry's HELOC had matured, and Grand Ridge was exploring options to extend the maturity date of that loan again. QPRT 2 notes that, in this email, Grand Ridge indicated that, if Henry elected to pursue a short sale of her St. Charles residence, Grand Ridge wanted additional collateral for the HELOC in the form of Henry pledging her Florida condominium. QPRT 2 questions why Grand Ridge would want the condominium as security for the HELOC if QPRT 2, which held title to that condominium, had already guaranteed the HELOC. Reading the email in context, Grand Ridge was contemplating a security interest in the Florida condominium. Unlike QPRT 2's existing guaranty of the HELOC, a security interest in the condominium would have allowed Grand Ridge to foreclose on that property directly if Henry failed to repay her HELOC in full. The October 11, 2017, email does not support the conclusion that QPRT 2 draws: that Grand Ridge did not believe that the October 2016 guaranty applied to the HELOC.

¶ 84                                III. CONCLUSION

¶ 85    For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 86    Affirmed.